Don M. DAVIS, as Executor of the Estate of Ethlyn M. Davis, Appellee/Cross-appellant,

v.

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., Appellant/Cross-appellee.

Nos. 88–5496/5520.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 13, 1989.

Decided June 15, 1990.

---

Lawrence T. Hofmann, Minneapolis, Minn., for appellant/cross-appellee.

Arlo Sommervold, Sioux Falls, S.D., for appellee/cross-appellant.

Before LAY, Chief Judge, and McMILLIAN and WOLLMAN, Circuit Judges.

McMILLIAN, Circuit Judge.

Merrill Lynch, Pierce, Fenner & Smith, Inc. (Merrill Lynch), appeals from a final judgment entered in the United States District Court[1] for the District of South Dakota upon a jury verdict awarding Don M. Davis (Davis), as executor of the estate of Ethlyn Davis, $100,000 in compensatory damages and $2,000,000 in punitive damages. For reversal, Merrill Lynch argues that the district court erred in instructing the jury (1) on the elements necessary to establish liability under Section 10(b) of the Securities Exchange Act of 1934 (Section 10(b)), 15 U.S.C. § 78j(b) (1988), common law fraud, and breach of fiduciary duty, (2) on compensatory damages, (3) on punitive damages, and (4) that Merrill Lynch could be held liable for punitive damages based on the acts or omissions of its employees acting within the scope of their employment. Merrill Lynch also argues that the punitive damages award violates its due process rights and is so grossly excessive that it justifies a new trial on all issues. On cross-appeal, Davis argues that the district court erred in granting Merrill

Lynch's motion for a remittitur after the first trial. For the reasons discussed below, we affirm the judgment of the district court.

## I. Facts

In 1972, Leonard Davis opened a brokerage account at Merrill Lynch's Minneapolis office for his wife, Mrs. Ethlyn Davis.[2] Mrs. Davis's account was invested primarily in high-quality, low-risk dividend-paying stocks, bonds, and certificates of deposit. Her account was nondiscretionary, meaning Merrill Lynch needed prior approval before placing orders to buy or sell securities. Until he died in 1976, Mr. Davis oversaw Mrs. Davis's account and took care of the family finances generally. Mrs. Davis had only a limited understanding of the stock market and her brokerage account.

Edward Marks, a Merrill Lynch officer and account executive, was responsible for handling Mrs. Davis's account. Marks had handled Leonard Davis's account from the time it was opened until Mr. Davis died. Between 1972 and 1981, Marks personally handled Ethlyn Davis's account. Marks knew that Mrs. Davis was an unsophisticated investor who completely trusted him and relied on his advice. Marks testified that he did not believe Mrs. Davis had ever turned down any of his investment recommendations.

In May 1981, because of a growing client base and increasing market sophistication, Marks transferred primary responsibility for Mrs. Davis's account to his hand-picked assistant, Merrill Lynch account executive Steven Ulrich. Mrs. Davis was eighty-seven years old at the time Ulrich took over her account. Marks promised Mrs. Davis that he would supervise Ulrich's handling of her account, and he did in fact supervise Ulrich. Marks testified that he reviewed every trade made by Ulrich in the Davis account until Ulrich was terminated in August 1984. Marks also received 90 percent

---

1. The Honorable John B. Jones, United States District Judge for the District of South Dakota.

2. Leonard Davis had maintained an account in his own name with Merrill Lynch since the mid–1960s, and continued to do so until his death in 1976.

of the commissions on the trades Ulrich made in the Davis account.

During a 31–month period from early 1982 to August 1984, Ulrich churned[3] the Davis account by making between 106 and 141 unauthorized trades.[4] These unauthorized trades amounted to nearly $2,000,000 in sales and purchases for an account with an average equity of $144,000. Merrill Lynch earned commissions in the amount of $43,468 from this unauthorized trading.[5]

Mrs. Davis received written confirmation tickets for each of the unauthorized trades. She also received monthly statements describing the total activity in her account the preceding month. There was some evidence that some of these statements were reviewed on occasion by her son, her grandson, and her accountant. Mrs. Davis also received several letters from Merrill Lynch that the company routinely sent out when annual commissions reached certain levels. Despite the fact that Mrs. Davis received these statements and letters, she never questioned or reported any of the unauthorized transactions, nor did she express any unhappiness with Ulrich or his handling of her account.

In August 1984 Merrill Lynch began investigating Ulrich's trading activities after another customer complained that Ulrich had made an unauthorized trade in his account. When Marks contacted Mrs. Davis for the first time since he assigned her account to Ulrich in 1981, Mrs. Davis informed him that she had not given Ulrich an order for two years. Merrill Lynch's investigation revealed that Ulrich improperly traded ten or twelve accounts. Merrill Lynch terminated Ulrich in August 1984.

Mrs. Davis filed suit against Merrill Lynch on August 16, 1985, in the United States District Court for the District of South Dakota, alleging federal securities fraud, common law fraud, breach of fiduciary duty, and conversion.[6] After a trial was held April 28, 1987, through May 4, 1987, the district court submitted the claims for federal securities fraud, common law fraud, and breach of fiduciary duty to the jury. The jury returned a general verdict in favor of Davis for $20,000 in compensatory damages and $2,250,000 in punitive damages. Merrill Lynch filed post-trial motions for judgment notwithstanding the verdict (JNOV), new trial, or remittitur. On July 21, 1987, the district court granted Merrill Lynch's motion for remittitur in the amount of $1,850,000, reducing the punitive damages award to $400,000. The district court ordered that if Davis did not accept the remittitur, then a new trial would be granted on the issue of damages. Davis refused the remittitur and a second trial on damages only was held in August 1988. On August 12, 1988, the second jury returned a verdict of $100,000 in compensatory damages and $2,000,000 in punitive damages. Merrill Lynch's post-trial motions for JNOV, new trial, or remittitur were denied. This timely appeal and cross-appeal followed.

## II. Liability Issues

The majority of Merrill Lynch's allegations of error involve allegedly erroneous jury instructions given by the dis-

---

**3.** "Churning" occurs when a broker, directing the volume and frequency of trades, abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account and the customer's objectives as expressed to the broker. Churning cannot occur as to any trade directed by the customer.

*Karlen v. Ray E. Friedman & Co.,* 688 F.2d 1193, 1203 (8th Cir.1982).

**4.** Although Merrill Lynch admits that Ulrich traded the Davis account without authorization, it argues that Ulrich made 106 rather than 141 unauthorized trades.

**5.** In 1982, Merrill Lynch collected $7,718 in commissions from Mrs. Davis, which represented 35% of her Merrill Lynch investment income for that year. In 1983, Merrill Lynch collected $19,774 in commissions from Mrs. Davis, about 53% of her Merrill Lynch investment income in 1983. In the first eight months of 1984, Merrill Lynch collected $16,276 in commissions from Mrs. Davis, approximately 67% of Mrs. Davis's Merrill Lynch investment income through August 1984.

**6.** In November 1986, Ethlyn Davis died, and her estate, represented by executor Don Davis (Mrs. Davis's son), was substituted as plaintiff.

trict court. "A district court has wide discretion in formulating appropriate jury instructions." *United States v. Ridinger,* 805 F.2d 818, 821 (8th Cir.1986) (*Ridinger*) (citation omitted). When reviewing jury instructions, we are only required to determine whether the instructions, when taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately present the issues in the case to the jury. *Jones v. Board of Police Comm'rs,* 844 F.2d 500, 504 (8th Cir.1988) (*Jones*), cert. denied, —— U.S. ——, 109 S.Ct. 2434, 104 L.Ed.2d 990 (1989). A judge is not required to give every proposed instruction, nor is he or she required to accept the particular phraseology proposed by any given litigant. Moreover, "[w]here the instructions, considered as a whole, adequately and sufficiently state the generally applicable law, the fact that the instructions are technically imperfect or are not a model of clarity does not render the charge erroneous." *Tribble v. Westinghouse Electric Corp.,* 669 F.2d 1193, 1197 (8th Cir.1982) (citations omitted) (*Tribble*), cert. denied, 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983). Nor will a single erroneous instruction necessarily require reversal if the error was cured by a subsequent instruction or by consideration of the entire charge. *Wright v. Farmers' Co-Op of Arkansas & Oklahoma,* 620 F.2d 694, 697 (8th Cir.1980) (*Wright*).

## A. Section 10(b) Liability

### 1. Scienter Requirement

■ Merrill Lynch first challenges the district court instructions to the jury during the first trial on the elements necessary to establish liability for churning under Section 10(b) and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5 (1988) (Rule 10b–5). Merrill Lynch claims that neither of the two Section 10(b) instructions given by the district

court adequately conveyed the scienter element, defined by the Supreme Court as the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Davis responds that the Section 10(b) instructions, when read in their entirety, adequately instructed the jury on the scienter requirement.[7]

The district court gave two instructions (Nos. 10 & 11) in the first trial that set forth the elements of Section 10(b) liability. In relevant part, Instruction No. 10 provided as follows:

> A stock broker has a duty to its customers under the rules of the New York Stock Exchange and the rules of the National Association of Securities Dealers to make trades only after receiving prior authorization from the customer, and to not churn the customer's account. "Churning" occurs when a broker, directing the volume and frequency of trades, willfully abuses his customer's confidence for personal gain by initiating transactions that are excessive in view of the character of the account and the customer's objectives. Churning, if established by preponderance of the evidence, is a deceptive device within the meaning of Rule 10b–5, and constitutes fraud and a violation of a broker's fiduciary duty to his customer.

In Instruction No. 11, the district court set forth the three types of conduct prohibited by subsections (a), (b), and (c) of Rule 10b–5, concluding that Davis "claim[s] that [Merrill Lynch], through an alleged wrongful course of conduct, *knowingly violated* each of subsections (a), (b), and (c) above during a period of time beginning on January 1, 1982 and ending with the end of 1984" (emphasis added). Merrill Lynch objected to Instructions Nos. 10 and 11 at trial on the ground that they omitted the scienter requirement and proposed two in-

---

7. In his reply brief, Davis further argues, apparently for the first time, that Merrill Lynch waived the scienter issue by admitting that it was responsible for the intentional and knowing unauthorized trading of Mrs. Davis's account. In response, Merrill Lynch, relying on Fed.R. App.P. 28(c), filed a motion to strike those por-

tions of Davis's reply brief which were not limited to the issues Davis raised in his cross-appeal. Because we have decided this case without relying on the allegedly improper arguments raised in Davis's reply brief, we need not decide whether portions of Davis's reply brief should be stricken.

structions which explicitly required the jury to find that Merrill Lynch acted with scienter. The district court refused the proposed instructions.

■ Although the district court could have been more explicit in instructing the jury on the scienter requirement, we hold that it did not abuse its "wide discretion" in instructing the jury on the elements of Section 10(b) liability. *See Ridinger,* 805 F.2d at 821. While we agree with Merrill Lynch that Instruction No. 11 merely summarizes Davis's claim and does not constitute an adequate definition of the scienter requirement, Instruction No. 10 provides that churning in violation of Rule 10b–5 occurs only when the broker *"willfully abuses his customer's confidence for personal gain"* (emphasis added). The requirement that the jury find willful abuse of the customer's confidence in order to establish liability under Rule 10b–5 adequately conveyed the necessity of finding scienter, a knowing or intentional deception.[8]

### 2. Ratification, Waiver and Estoppel

■ Merrill Lynch's second attack on the jury's finding of liability for churning centers on the failure of Mrs. Davis or other members of her family to notify Merrill Lynch of the unauthorized trading despite the fact that Mrs. Davis received confirmation slips and monthly statements documenting each trade. Merrill Lynch emphasizes that the relationship between broker and customer is conducted almost exclusively by telephone and that the internal paperwork generated by a trade order is the same whether or not the trade is authorized. Merrill Lynch argues that the nature of the securities business is such that absent notification from the customers, detection of unauthorized trades is nearly impossible.

The gist of Merrill Lynch's argument is that Mrs. Davis's failure to notify the company of the unauthorized trades despite her receipt of documentation amounts to ratification of the improper trades or waiver of her right to challenge the unauthorized trading. In *Karlen v. Ray E. Friedman & Co.,* 688 F.2d 1193 (8th Cir.1982) (*Karlen*), we made it clear that ratification and waiver arguments bear a heavy burden in the churning context. We held that "[t]he question is not simply whether [the customer] assented to the [unauthorized] trades; rather it is whether [the customer's] apparent assent was given voluntarily and intelligently with full knowledge of the facts." *Id.* at 1198. We then proceeded to specifically reject the broker's contention that it was relieved of liability for churning by the customer's failure to report the unauthorized trading after receiving written confirmations and monthly statements. The *Karlen* court reasoned as follows:

> It has been recognized that confirmation slips and monthly statements do not enable a customer to determine his or her overall position or the total amount of real profit or loss occurring, unless the customer is sufficiently skilled to elaborate upon them to make that determination.... When a customer lacks the skill or experience to interpret confirmation slips, monthly statements or other such documents, courts have generally refused to find that they relieve a broker of liability for its misconduct.

*Id.* at 1200 (citations omitted).

■ The record in the present case clearly establishes that Mrs. Davis lacked the skill or experience to interpret confirmation slips or monthly documents. Mrs. Davis was an elderly woman who was unsophisticated in financial matters in general and the securities industry in particular. Marks knew that Mrs. Davis was an unsophisticated investor who completely relied on his advice. Based on Mrs. Davis's lack of skill and reliance on her broker, it is clear that her alleged ratification or waiver

---

8. Merrill Lynch also argues that the district court prejudicially confused the jury by providing three definitions of fraud which failed to adequately distinguish between federal securities fraud and common law fraud. We disagree. Although the fraud instructions are not models of clarity, they are not so confusing that the issues were not adequately presented to the jury. *See Tribble v. Westinghouse Elec. Corp.,* 669 F.2d 1193, 1197 (8th Cir.1982), *cert. denied,* 460 U.S. 1080, 103 S.Ct. 1767, 76 L.Ed.2d 342 (1983).

was not given "voluntarily and intelligently with full knowledge of the facts." *Id.* at 1198.[9]

We further note that the questions of ratification and waiver are factual issues. *Karlen,* 688 F.2d at 1198. Merrill Lynch had the opportunity to argue to the jury that it should be excused from liability because Mrs. Davis failed to report the unauthorized trading after receiving confirmations for each trade as well as monthly statements. The jury chose to reject Merrill Lynch's argument and find the company liable, and we see no reason to upset the jury's verdict.

We are also unconvinced by Merrill Lynch's contention that the nature of the securities industry is such that it should be excused from liability from churning when the customer fails to report unauthorized trades.[10] Even assuming that Merrill Lynch and Mrs. Davis are equally innocent, Merrill Lynch should nonetheless bear the risk of loss from the churning: "Between a principal and a third party, the principal must bear the burden of an agent who has acted improperly." *Rosebud Sioux Tribe v. A & P Steel, Inc.,* 733 F.2d 509, 518 (8th Cir.) *(Rosebud ), cert. denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984).

### B. Breach of Fiduciary Duty

■ Merrill Lynch next challenges Instruction No. 12, given at the first trial, which provided that "[i]n connection with the plaintiff's claim that [Merrill Lynch] breached a fiduciary duty, you are instructed that in South Dakota the relationship between a licensed broker such as Merrill Lynch and its customers is a fiduciary rela- tionship." Merrill Lynch objected to this instruction on the ground that it erroneously directed that a fiduciary relationship exists between a broker and customer as a matter of law. The district court refused Merrill Lynch's proposed Instruction No. 10, which would have required the jury to make certain factual findings before finding a fiduciary relationship.

On appeal, Merrill Lynch argues that the judgment should be reversed because, as a matter of law, nondiscretionary accounts cannot give rise to a fiduciary relationship. Merrill Lynch admits that South Dakota has not decided whether a broker owes his or her customer a fiduciary duty, but argues that, in the absence of dispositive state precedent, we should follow other decisions of this circuit which have held that nondiscretionary accounts such as the Davis account do not give rise to a fiduciary relationship. *See, e.g., Horn v. Ray E. Friedman & Co.,* 776 F.2d 777, 779 (8th Cir.1985) *(Horn )* (applying Arkansas law); *Ray E. Friedman & Co. v. Jenkins,* 738 F.2d 251, 254 (8th Cir.1984) *(Jenkins )* (applying North Dakota law). Merrill Lynch contends that, at a minimum, the case should be remanded for the jury to decide whether special circumstances existed that warrant the finding of a fiduciary relationship.

Davis argues that Instruction No. 12 was correct because the South Dakota Supreme Court has held that a fiduciary relationship exists between real estate brokers and their clients. *Hurney v. Locke,* 308 N.W.2d 764, 768 (S.D.1981) *(Hurney ).* Davis also argues that Instruction No. 12 was proper because the uncontroverted evi-

---

9. The fact that Mrs. Davis's son, grandson, and accountant may have reviewed Mrs. Davis's account statements on occasion does not alter our analysis. The relevant inquiry is whether the owner of the account possesses the requisite skill and experience to interpret and understand monthly statements and confirmation slips. The ability of non-account holders to understand account documentation, be they family members, relatives, or accountants, is not at issue. Such individuals simply have no duty to examine someone else's account materials.

10. Although Merrill Lynch argues that it is impossible to detect unauthorized trading absent customer notification, we do not take such a dim view of the review process. Perhaps different procedures can be developed and implemented which will be more effective in detecting churning. For instance, several bank card companies telephone their customers to guard against unauthorized use when their computer records indicate an unusual increase in the number of charges made on the customer's credit card accounts. Perhaps such a policy could be implemented by Merrill Lynch. Other security measures and review procedures are also likely to be developed over time as technology advances.

dence established that Mrs. Davis was unsophisticated in financial matters, trusted Merrill Lynch, totally relied on the advice of her broker, and that Merrill Lynch exercised *de facto* control over her account despite the fact that it was nondiscretionary in title.

The question of whether a fiduciary relationship exists is a question of state law. *Horn*, 776 F.2d at 779. On appeal, we accord substantial deference to the trial court's interpretation of state law. *Perkins v. Clark Equipment Co.*, 823 F.2d 207, 208 (8th Cir.1987) (*Perkins*). Both parties agree that the South Dakota legislature or courts have not decided whether a fiduciary relationship exists between a securities broker and his or her customers. When a state's highest court has not resolved an issue, we will reverse the trial court's interpretation of that state's law only if it is fundamentally deficient in analysis or otherwise lacking in reasoned authority. *Id.* at 208; *Barber–Greene Co. v. National City Bank of Minneapolis*, 816 F.2d 1267, 1270 (8th Cir.1987).

After careful review of South Dakota law, we hold that the district court's decision to instruct the jury that a fiduciary relationship exists between brokers and their customers was not fundamentally deficient in analysis or otherwise lacking in reasoned authority. Eighty years ago, the South Dakota Supreme Court held that real estate brokers owe a fiduciary duty to their clients. The court held as follows:

> The relation of an agent to his principal is ordinarily that of a fiduciary, and, as such, it is his duty to act with entire good faith and loyalty for the furtherance and advancement of the interest of his principal in all dealings concerning or affecting the subject-matter of his agency. And this rule is just as applicable to an agent whose duty it is to find a purchaser for the real estate of his principal as any other. Such an agent owes to his principal the obligation of securing for the principal the highest price he can obtain for such property.

*Durand v. Preston*, 26 S.D. 222, 128 N.W. 129, 131 (1910) (citation omitted). The South Dakota Supreme Court recently reaffirmed that the relationship between a real estate broker and his or her clients is a fiduciary one, holding that the broker owes clients "a duty of utmost good faith, integrity, and loyalty." *Hurney*, 308 N.W.2d at 768. The *Hurney* court reasoned that a fiduciary duty should be imposed on real estate agents or brokers because "[a] real estate agent is a licensed professional holding himself out as trained and experienced to render a specialized service ... Clients rely on the agent's expertise and expect the agent to act in their best interests." *Id.* (citation omitted). Likewise, securities brokers such as Marks and Ulrich at Merrill Lynch are "licensed professional[s] holding [themselves] out as trained and experienced to render a specialized service." *Id.* Like the clients of real estate agents, securities customers "rely on the agent's expertise and expect the agent to act in their best interests." *Id.* Because we see no significant difference between real estate brokers and securities brokers, we believe that if confronted with the question, the South Dakota Supreme Court would find that securities brokers are fiduciaries that owe their customers "a duty of utmost good faith, integrity and loyalty." *Id.* Accordingly, we hold that the district court did not abuse its discretion in instructing the jury that a fiduciary relationship exists between licensed securities brokers and their customers.

We are unpersuaded by Merrill Lynch's contention that the precedent of this circuit requires us to hold that nondiscretionary securities accounts cannot give rise to a fiduciary relationship between securities brokers and customers as a matter of law. First, the question of whether a fiduciary duty existed between Merrill Lynch and Mrs. Davis is a question of South Dakota law, and none of the Eighth Circuit cases cited by Davis construe South Dakota law. We find the South Dakota cases of *Durand* and *Hurney* to be more reliable indicators of how the South Dakota Supreme Court would resolve the question of whether a fiduciary relationship exists between a securities broker and his or her customers.

Furthermore, we believe that Merrill Lynch misconstrues Eighth Circuit precedent by attaching undue significance to whether or not a securities account is discretionary or nondiscretionary. Whether an account is discretionary or nondiscretionary is only one factor we examine in determining whether a securities broker owes a fiduciary duty to his or her customers. For instance, in *Horn,* we held that under Arkansas law a commodities brokerage firm and its president did not owe a fiduciary duty to the plaintiff commodities broker because the broker's account was nondiscretionary and was actually controlled and traded by the broker. 776 F.2d at 779–80. After noting that the plaintiff "concedes that defendants did not control the trading in his account," we ruled that there was nothing in the facts sufficient to give rise to a fiduciary relationship between the defendants and the plaintiff broker. *Id.* In *Jenkins,* 738 F.2d at 254, a case applying North Dakota law, we held that the district court did not err in refusing to give an instruction that the commodities firm owed a fiduciary duty to the plaintiff. We found that "[s]ince the account was nondiscretionary and controlled by [plaintiff], there is likewise no merit in his contention that an instruction on fiduciary duty should have been given. '[Plaintiff] was a sophisticated, reckless trader who gambled big and lost.' " *Id.* (citation

omitted). While *Horn* and *Jenkins* thus note that the plaintiff's brokerage account was nondiscretionary, they do so as part of the larger inquiry of determining who actually controlled the account.[11]

The importance of examining the entire broker-customer relationship rather than merely the status of the account was well stated in *Baker v. Wheat First Securities:*

> The Court does not believe that the discretionary—nondiscretionary dichotomy is the shibboleth which [defendant] attempts to make it out to be. While a few courts have based their holdings on the distinction, the Court does not find that the question will necessarily always be so neatly suitable for resolution ... [For instance, the Ninth Circuit] imposes fiduciary obligations where the agent for all practical purposes controls the account. The Ninth Circuit also noted ... in the context of churning, that the requisite degree of control is met when the client routinely follows the recommendations of the broker such that a pattern of de facto control by the broker develops.

643 F.Supp. 1420, 1428–29 (S.D.W.Va.1986) (citations omitted). We refuse to elevate form over substance by holding that nondiscretionary accounts can never give rise to a fiduciary relationship. To do so in this case would result in manifest injustice. When analyzing fiduciary duty claims arising from unauthorized trading of securi-

11. We acknowledge that our decision in *Greenwood v. Dittmer,* 776 F.2d 785 (8th Cir.1985) (*Greenwood*), a case applying Arkansas law, can be read as establishing a bright line rule that nondiscretionary commodities accounts cannot give rise to a fiduciary relationship between broker and customer. The court held that "[w]e defer to the determination of the District Court that, under Arkansas law, no fiduciary duty arises between a broker and his client in relation to a non-discretionary commodity trading account." *Id.* at 788. The court thus held that the district court did not err in directing a verdict in defendant's favor on plaintiff's fiduciary duty claim. We find *Greenwood* inapplicable to this case for three reasons. First, *Greenwood* involved Arkansas law, and South Dakota law is at issue here. Secondly, *Greenwood* deferred to the district court's determination that nondiscretionary accounts could not create a fiduciary duty. In the present case, the district court determined that the relationship between licensed brokers and their custom-

ers is a fiduciary one. Finally, *Greenwood* may not preclude an examination into who actually exercised control over the account. In holding that nondiscretionary commodities did not give rise to a fiduciary relationship, the *Greenwood* court relied in part on *Ray E. Friedman & Co. v. Jenkins,* 738 F.2d 251, 254 (8th Cir.1984) (*Jenkins*), an earlier decision applying the Arkansas law of fiduciary duty. In *Jenkins* we held "[s]ince the account was nondiscretionary *and controlled by [plaintiff],* there is likewise no merit in his contention that an instruction on fiduciary duty should have been given." *Id.* (emphasis added). *Jenkins* makes clear that both the status of the account *and* who actually exercised control is to be examined in determining whether a fiduciary duty exists. We are neither bound nor persuaded by *Greenwood,* and decline to apply its holding to overrule the well-supported judgment of the district court that a fiduciary duty exists between licensed securities brokers and their customers under South Dakota law.

ties, the crucial question is who exercised actual control over the account. Whether an account is discretionary or nondiscretionary is one factor that indicates control. However, if for all practical purposes the broker exercised de facto control over a nondiscretionary account and the client routinely followed the recommendations of the broker, then a finding of fiduciary duty may be warranted. In the case at bar, the facts establish that Merrill Lynch exercised de facto control over the Davis account. In contrast to the professional commodities broker in *Horn* and the sophisticated trader in *Jenkins*, Mrs. Davis was an unsophisticated investor who totally relied on the advice of her broker. Marks testified that he could not recall a single instance when Mrs. Davis did not follow his advice. Ulrich made dozens of unauthorized trades without consulting Mrs. Davis. When these facts are reviewed in light of existing South Dakota precedent, it is clear that the district court's instruction that a fiduciary relationship existed between Merrill Lynch and Mrs. Davis was not fundamentally deficient in analysis or otherwise lacking in reasoned authority. *See Perkins*, 823 F.2d at 208.

In sum, we hold that the district court did not abuse its discretion in instructing the jury that a fiduciary duty exists between licensed brokers and their customers, and we reject Merrill Lynch's contention that the precedent of this circuit requires us to find that nondiscretionary securities accounts can never give rise to a fiduciary relationship.

## III. Compensatory Damages Instructions

■ Merrill Lynch next argues that the trial court erred by giving a damages instruction in the second trial which allowed the jury to award compensatory damages even though Davis suffered no out-of-pocket losses from the unauthorized trading. Merrill Lynch argues that damages under Section 10(b), common law fraud, and breach of fiduciary duty are limited to out-of-pocket losses. Merrill Lynch contends that Davis suffered no out-of-pocket losses because her account realized a net profit of over $53,000 during the time when the account was churned. Merrill Lynch further argues that since there were no compensatory damages to support the award of punitive damages, the district court erred in denying its motions for a directed verdict and JNOV on the punitive damages issue. Davis responds that the district court's compensatory damages instruction was based on *McGinn v. Merrill Lynch, Pierce, Fenner & Smith*, 736 F.2d 1254 (8th Cir. 1984) (*McGinn*), and adequately instructed the jury on the elements of compensatory damages recoverable in churning cases.

We disagree with Merrill Lynch's contention that the jury was permitted to award compensatory damages when no actual losses were sustained. The district court instructed the jury that it could award the following damages as compensatory damages:

(1) Commission[s] paid to defendant in connection with the unauthorized trades or the churning; and

(2) Loss of value of Ethlyn Davis's account or the out-of-pocket loss suffered by Mrs. Davis. This amount would be the value that her account would have had if there had been no unauthorized trades or churning, less the amounts she actually received, including both the value of her account and the $8,000 paid her by the defendant.

Instruction No. 10 (Trial II). This damage instruction incorporated only those elements of damages deemed proper for churning cases in *McGinn*. *McGinn* recognized that defrauded customers sustained two distinct types of damages in churning cases: "(1) loss of commissions, interest, and fees paid by the customer; (2) loss of the value of the account." 736 F.2d at 1257.[12] *See Nesbit v. McNeil*, 896 F.2d

---

**12.** Despite the fact that *McGinn v. Merrill Lynch, Pierce, Fenner & Smith*, 736 F.2d 1254, 1257 (8th Cir.1984) (*McGinn*), specifically sets forth the elements of compensatory damages recoverable in churning cases, Merrill Lynch urges us to ignore *McGinn* and apply a more general damage standard applicable to other types of securities fraud. In *Harris v. Union Elec. Co.*, 787 F.2d 355 (8th Cir.), *cert. denied*, 479 U.S. 823, 107 S.Ct. 94, 93 L.Ed.2d 45 (1986), we discussed

380, 385 (9th Cir.1990) (*Nesbit*) (churning causes two distinct types of damages: the amount of excess commissions and the decline in account value); *Miley v. Oppenheimer*, 637 F.2d 318, 327 (5th Cir.1981) (same). While the amount of actual damages sustained as a result of churning is often difficult to calculate with mathematical certainty, we "have repeatedly stressed that some uncertainty in damages should not work to bar a plaintiff from recovering from a proved wrongdoer." *Id.* (citing cases).

In accordance with *McGinn*, the jury was instructed that the damages should include the amount of commissions and the loss of value of the account. Contrary to Merrill Lynch's suggestion, the jury was not required or permitted to speculate as to these amounts. At trial, Davis's damage expert testified to the amount of excess commissions paid and the amount of lost profits, concluding that Davis sustained compensatory damages of $107,341.15.[13] After preserving its objection to the district court's damage formula, Merrill Lynch argued in closing that, under the district court's standard, the amount of compensatory damages was $93,000.[14] The jury awarded actual damages of $100,000. The jury may have split the difference between the two parties' calculations of the amount on compensatory damages, or it might have decided not to award the additional $7,341.15 requested by Davis on the theory that Mrs. Davis would have paid

this amount in commissions if the account had been traded properly. Because Davis proved up over $107,000 in actual damages and Merrill Lynch admitted that the compensatory damages were $93,000, we cannot say that the jury's award of $100,000 in compensatory damages was speculative.

We disagree with Merrill Lynch's argument that no actual damages were sustained because after deducting the unauthorized commissions, the account nevertheless realized a cumulative net profit of over $53,000 during the period it was churned. The implications of this argument are disturbing. If we were to adopt Merrill Lynch's view, securities brokers would be free to churn their customers' accounts with impunity so long as the net value of the account did not fall below the amount originally invested. Churning is not excused by the fact that the account realizes a new profit. In *Nesbit*, 896 F.2d at 386, the Ninth Circuit refused to offset the gains in portfolio against the losses in commissions. The court held that allowing securities customers to recover compensatory damages in the amount of excess commissions even when the account realizes a profit will have the salutary deterrent effect of "inform[ing] the brokerage community that churning is a fraud that will violate the securities laws, regardless of the ultimate condition of the client's portfolio." *Id.* We agree. Churning is a species of fraud prohibited by Section 10(b) and Rule

the measure of damages for a securities fraud case involving misrepresentations or material omissions which caused the plaintiff to purchase a security or bond at an inflated price. We held that "[t]he proper measure of damages in this case is the difference between the purchase price and the actual value of the bonds on the date they were issued." *Id.* at 367. Churning is a unique form of securities fraud because it does not involve the sale of overvalued securities. Indeed, as in this case, the account can make a net profit despite the churning. In *McGinn*, we recognized the distinct nature of churning fraud and specifically addressed the elements of compensatory damages recoverable in churning cases. We held that the profits the plaintiff would have realized had the account not been churned was one element of actual damages. 738 F.2d at 1257. The *McGinn* damage formulation for churning governs this case, and we decline Merrill Lynch's invitation to

apply a damages standard applicable to non-churning securities fraud cases.

**13.** The amount of total commissions Mrs. Davis paid was $43,468, the net deposits made to the account during the period of unauthorized trading was $16,238.10, and the account would have made $55,635.05 more than it did if churning had not occurred, for a total of $115,341.15. Merrill Lynch paid Mrs. Davis $8,000 when it discovered the unauthorized trading, which was deducted from the $115,341.15 figure, leaving a total of $107,341.15 in compensatory damages.

**14.** At the second trial, Merrill Lynch witness James Mofsky testified that the amount of compensatory damages was $71,873.15 plus interest. During closing argument, counsel for Merrill Lynch stated that "the compensatory damages in this case are $93,000."

10b(5) regardless of whether the account's profits or its principal is misappropriated. Under the law of this circuit, if an account earned $50,000 but would have earned $100,000 if it was not churned, the customer has sustained actual damages in the amount of $50,000 plus excess commissions paid. *See McGinn*, 736 F.2d at 1257. Because Mrs. Davis paid over $40,000 in commissions and would have earned over $50,000 more than she did had her account not been churned, it is nonsensical to argue that she did not suffer actual damages as a result of the churning.

■ Merrill Lynch also alleges that the district court erred in giving one damage instruction to cover all three of Davis's causes of action, but fails to state with particularity how it was harmed by the use of one instruction. Davis alleges that Merrill Lynch violated Section 10(b), committed common law fraud, and breached its fiduciary duty by churning the account. While three causes of actions are alleged, they each arise out of the same course of conduct and caused one single indivisible sum of actual damages—the profits lost and the excess commissions generated by the churning. The jury found Merrill Lynch liable on all three causes of action. In South Dakota, compensatory damages for common law fraud are limited to the amount necessary to make the injured party whole. *Hulstein v. Meilman Food Industries, Inc.*, 293 N.W.2d 889, 891 (S.D. 1980) (*Hulstein*). Similarly, compensatory damages for breach of fiduciary duty are limited to out-of-pocket losses. *Zee v. Assam*, 336 N.W.2d 162, 165 (S.D.1983). While we agree that the damages recoverable for fraud or breach of fiduciary duty are limited to the amount necessary to make the injured party whole and out-of-pocket losses respectively, Merrill Lynch fails to cite precedent or explain why Davis is not entitled to the measurement of compensatory damages for churning as set forth in *McGinn*.[15] We hold that the dis-

trict court's use of one damage instruction did not prejudice Merrill Lynch.

## IV. Punitive Damages

Merrill Lynch challenges the punitive damages award on several grounds. Merrill Lynch argues that three of the district court's jury instructions constituted reversible error; that the district court erred in instructing the jury that Merrill Lynch could be held liable for punitive damages based on the acts of its non-managerial employees; that the $2,000,000 punitive damages award was grossly excessive; and that the punitive damages award violated its due process rights. We are not persuaded by any of these arguments, and accordingly affirm the jury's award of punitive damages.

### A. Jury Instructions

■ Merrill Lynch first attacks the punitive damages award by arguing that the district court committed three errors in instructing the jury on punitive damages in the second trial. First, Merrill Lynch contends that the district court erred in instructing the jury that Merrill Lynch had been found liable on all three causes of action in the first trial. Instruction No. 8, the challenged instruction, provides as follows:

> It has been determined as a matter of law that defendant Merrill Lynch, Pierce, Fenner & Smith Inc. made unauthorized trades of securities held in the account of Ethlyn M. Davis, now deceased, and churned her account, thereby violating Rule 10(b)-5 of the Securities and Exchange Commission and defrauding her and breaching its fiduciary duty to her.

Merrill Lynch claims this instruction was improper because the district court used a general verdict form in the first trial and there was no way of telling upon which of the three causes of action the jury had found Merrill Lynch liable. Merrill Lynch

---

**15.** Because we hold there was sufficient proof that Davis sustained actual damages of approximately $100,000 from Merrill Lynch's securities fraud, breach of fiduciary duty, and common law fraud, it is not necessary to reach Merrill

Lynch's argument that the district court erred in refusing to grant a directed verdict or JNOV on the punitive damages issue on the ground that there were no actual damages under the state law claims.

asserts that this instruction put it in the worst possible light. Davis argues that Instruction No. 8 simply summarized the jury's verdict in the first trial, namely that Merrill Lynch had churned Mrs. Davis's account. Davis further argues that the instruction was proper because Merrill Lynch admitted it had made unauthorized trades in the Davis account.

We agree with Merrill Lynch that, where possible, it is preferable that juries be given special verdict forms to facilitate effective appellate review. *See Mueller v. Hubbard Milling Co.*, 573 F.2d 1029, 1038–39 (8th Cir.), *cert. denied*, 439 U.S. 865, 99 S.Ct. 189, 58 L.Ed.2d 174 (1978). However, the district court did not abuse its discretion in using a general verdict form in the first trial or in giving Instruction No. 8 in the second trial. At the first trial, the jury found Merrill Lynch liable and awarded Davis $20,000 in compensatory damages and $2,250,000 in punitive damages. After Davis refused to accept the district court's order of remittitur, a second trial was held solely on the issue of damages. Instruction No. 8 merely summarized the first jury's finding of liability for churning. Moreover, Merrill Lynch admitted that one of its brokers had churned Mrs. Davis's account. Other than speculating that the instruction put it in the worst possible light, Merrill Lynch fails to explain in what respect the instruction caused it harm or how the district court could have described the results of the first trial in a less prejudicial manner. Without more, Merrill Lynch's conjecture of prejudice is not enough to justify reversal.

Merrill Lynch next argues that the punitive damages instruction in the second trial requires reversal because it omitted any reference to the burden of proof. It is true that Instruction No. 11, the punitive damages instruction, does not explicitly state that Davis bears the burden of proof of establishing all the necessary elements. However, South Dakota law does not require that the burden of proof requirement be given as part of the punitive damages instruction itself. In both trials, the district court instructed the jury that "[t]he

party who asserts the affirmative of an issue has the burden of proving that issue by a preponderance of the evidence." Instruction No. 15 (Trial I); Instruction No. 9 (Trial II). Viewing the instructions as a whole, we find they adequately instructed the jury on the burden of proof.

Merrill Lynch next argues that the trial court committed reversible error by instructing the jury in the second trial that punitive damages must be awarded. The challenged instruction provides in relevant part as follows:

A person who has suffered a loss through the fraud of another person may recover, in addition to actual damages, punitive damages for the sake of example and by way of punishing such other party. It has been determined that this is a proper case for the awarding of punitive damages.

Instruction No. 11 (Trial II) (emphasis added).

Merrill Lynch claims that the underscored portion of Instruction No. 11 was prejudicial because it effectively mandated that the jury award punitive damages. Merrill Lynch points out that under South Dakota and federal law, the decision of whether or not to award punitive damages is always left to the jury's discretion, and that punitive damages are never awarded as a matter of right. *See Smith v. Wade*, 461 U.S. 30, 52, 103 S.Ct. 1625, 1638, 75 L.Ed.2d 632 (1983) ("[A] key feature of punitive damages [is]—that they are never awarded as a matter of right, no matter how egregious the defendant's conduct"); S.D. Codified Laws Ann. § 21–3–2 (Michie 1987) ("Punitive damage : in discretion of jury").

When read in isolation, the sentence Merrill Lynch finds objectionable could have misled the jurors into believing that they were required to award punitive damages. The district court should have refrained from instructing the jury that this was a proper case for awarding punitive damages, or qualified the instruction by stating that although the jury was entitled to award punitive damages, it was not required to do so. However, jury instructions are read as a whole, and a judgment

will not be reversed unless the substantial rights of a party were prejudiced. *See Tribble*, 669 F.2d at 1197; *Rosebud*, 733 F.2d at 517. Just prior to the language Merrill Lynch finds objectionable, the district court instructed the jury that Davis *"may* recover, in addition to actual damages, punitive damages" (emphasis added).[16] Immediately after the objectionable sentence in Instruction No. 11, the district court enumerated the five factors the jury should consider in determining the amount of punitive damages. Moreover, in its compensatory damages instruction, which immediately preceded the punitive damages instruction, the district court made clear that the jury was not required to award damages. *See* Instruction No. 10 ("Whether any of these elements of damages have been proved by the evidence is for you to determine. Your verdict must be based on evidence and not upon speculation, guesswork or conjecture."). We hold that when read as a whole, the jury instructions in the second trial did not require the jury to award punitive damages.

## B. Vicarious Liability

 Merrill Lynch next objects to Instruction No. 14 which was given at the first trial. Instruction No. 14 provided that "[a] corporation can act only through its officers and employees. Any act or omission of an officer or employee within the scope of his or her employment is the act or omission of the corporation for which he or she was then acting." Merrill Lynch claims that this instruction effectively subjected it to strict vicarious liability for the acts of its employees. At both trials, Merrill Lynch proffered a "complicity" instruction based on the Restatement (Second) of

Torts § 909 (1979) (Section 909), which provided that Merrill Lynch could be held liable for punitive damages for the acts of Ulrich only if it authorized or ratified his acts, or if it was reckless in hiring him.[17] The district court refused to give the proposed complicity instructions.

Merrill Lynch admits that South Dakota has not addressed whether an employer can be held liable for punitive damages based on the wrongful acts of an employee committed within the scope of his or her employment. However, Merrill Lynch argues that the trend is towards adopting some version of Section 909, that the jurisdictions surrounding South Dakota have adopted it, and that South Dakota would do likewise. *See Briner v. Hyslop*, 337 N.W.2d 858, 867 (Iowa 1983); *Mahanna v. Westland Oil Co.*, 107 N.W.2d 353, 363 (N.D.1960); *Garcia v. Samson's, Inc.*, 10 Wis.2d 515, 103 N.W.2d 565, 567 (1960); *Campen v. Stone*, 635 P.2d 1121, 1125 (Wyo.1981); Minn.Stat. § 549.20(2) (West 1988) (legislative enactment of similar rule). Merrill Lynch further argues that South Dakota consistently relies on the Restatement when no state precedent exists. *See McElhaney v. Eli Lilly & Co.*, 564 F.Supp. 265, 269 (D.S.D.1983); *Hagberg v. City of Sioux Falls*, 281 F.Supp. 460, 467 (D.S.D.1968). Merrill Lynch places particular reliance on *Leafgreen v. American Family Mutual Insurance Co.*, 393 N.W.2d 275 (S.D.1986), where the South Dakota Supreme Court looked to the Restatement (Second) of Agency to determine when a principal may be held liable for the unauthorized acts of an agent. Merrill Lynch also contends that Section 909 is well suited for securities cases, citing *Ald-*

---

**16.** The second trial was limited to determining the amount of damages. In the first trial, the district court made it clear that the jury may but was not required to award punitive damages. *See* Instructions Nos. 17 and 18 (Trial I).

**17.** Restatement (Second) of Torts § 909 (1979) provides in full that
Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,
 (a) the principal authorized the doing and the manner of the act, or

 (b) the agent was unfit and the principal was reckless in employing or retaining [the agent], or
 (c) the agent was employed in a managerial capacity and was acting in the scope of employment, or
 (d) the principal or a managerial agent of the principal ratified or approved the act.
This provision is also set forth at Restatement (Second) of Agency § 217 C (1958). For ease of reference, we will refer only to Restatement (Second) of Torts § 909.

*rich v. Thomson McKinnon Securities, Inc.,* 756 F.2d 243, 247 (2d Cir.1985); *Malandris v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 703 F.2d 1152, 1174–75 (10th Cir.1981), *cert. denied,* 464 U.S. 824, 104 S.Ct. 92, 78 L.Ed.2d 99 (1983). Davis responds that the trial court's instruction was a proper statement of corporate law and in accordance with South Dakota and Eighth Circuit precedent. Davis further argues that even if Section 909 were adopted in South Dakota, Merrill Lynch would still be liable.

When a state has not spoken on an issue, we accord substantial deference to the district court's interpretation of state law, reversing only if the court did not correctly apply local law or if its interpretation is fundamentally deficient in analysis or otherwise lacking in reasoned authority. *Perkins,* 823 F.2d at 208; *Hazen v. Pasley,* 768 F.2d 226, 228 (8th Cir.1985). Reviewing the district court's instruction under this standard, we cannot conclude that it committed reversible error.

Instruction No. 14 was not fundamentally deficient in analysis or otherwise lacking in reasoned authority. First, Instruction No. 14 is based on South Dakota Pattern Jury Instructions No. 50.11 (1968), which indicates that it is a correct statement of the law in South Dakota. *See Rosebud,* 733 F.2d at 518. Secondly, the South Dakota Supreme Court has recognized that corporations are artificial legal creations that can act only through their officers and agents. *Aimonetto v. Rapid Gas, Inc.,* 80 S.D. 453, 126 N.W.2d 116, 119 (1964). Applying federal and South Dakota law in *Rosebud,* we held that "[a] principal is liable for the deceitful or fraudulent acts of its agents, which are committed in the course of the business the agent was appointed to carry out.... This is true even if the agent's conduct is carried on without the principal's knowledge." 733 F.2d at 517 (citations omitted). Merrill Lynch cites no South Dakota cases indicating that the principles of *respondeat superior* would not be applied to cases involving punitive damages.[18] We hold that the district court's vicarious liability instruction and its refusal to give Merrill Lynch's complicity instructions were well grounded in and justified by South Dakota law as it existed at the time of trial.[19]

---

**18.** We are unpersuaded by Merrill Lynch's argument that *Leafgreen v. American Family Mut. Ins. Co.,* 393 N.W.2d 275 (S.D.1986) (*Leafgreen*), required the district court to give its proposed complicity instructions. In construing the scope of *respondeat superior,* the South Dakota Supreme Court held that because the issue before the court was "one of first impression in South Dakota ... we are guided, *in part,* by various rules set out in the Restatement (Second) of Agency." *Id.* at 277 (emphasis added). First, *Leafgreen* does not mandate that Restatement of Agency rules be adopted where the Restatement is at variance with the related South Dakota precedent. Secondly, *Leafgreen* may well support the district court's interpretation of South Dakota law. In *Leafgreen,* the court held that a principal may be held liable for fraud committed by the agent even if the principal "is entirely innocent, has received no benefit from the transaction, and ... the agent acted solely for his own purposes" and benefit. *Id.* at 278 (quoting Restatement (Second) of Agency § 261 comment a). If anything, these principles support the challenged jury instruction.

**19.** While this case was pending on appeal, and nearly two years after the district court's challenged interpretation of state law, the Supreme Court of South Dakota decided *Olson v. Tri-*

*County State Bank,* 456 N.W.2d 132 (S.D.1990) (*Olson*). In *Olson,* the state supreme court held that the bank was vicariously liable for the fraud committed by one of its vice-president branch managers. At 134. The court applied the Restatement (Second) of Torts § 909 to determine whether the employer could be held vicariously liable in punitive damages for the acts of its employees. *Id.* at 134. The court held that "[l]iability will be imposed upon the principal when the nexus is sufficient to make the resulting harm foreseeable." *Id.* at 135. The harm caused by the employee is foreseeable "if the agent's employment puts him in a position where his harmful conduct would not be 'so unusual or startling that it would be unfair to include the loss among the costs of the employer's business.'" *Id.* at 135 (quoting *Leafgreen,* 393 N.W.2d at 280–81).

Applying this standard to the facts of the present case, it is clear that Merrill Lynch is vicariously liable in punitive damages for the acts of Ulrich. Securities brokers are responsible for managing their clients' money, and thus hold positions of trust. Like the bank branch manager in *Olson,* it "is far from unusual or startling that [a securities broker] would use his position to misappropriate money." *Id.* at 135. It is certainly not unfair to include the loss caused by Ulrich among Merrill

## C. Excessiveness of Punitive Damages

■ Merrill Lynch next argues that the $2,000,000 punitive damages award is so grossly excessive that it could have resulted only from passion or prejudice. Merrill Lynch requests this court to order a new trial or, in the alternative, reduce the punitive damages award to $100,000. Davis responds that while the award is large, it is reasonable under the five factors identified as relevant under South Dakota law.

■ Because South Dakota law governs Davis's breach of fiduciary duty and common law fraud claims, whether the punitive damages award is excessive is determined by reference to South Dakota law.[20] *See Ouachita National Bank v. Tosco Corp.*, 686 F.2d 1291, 1297 (8th Cir.1982) (subsequent history omitted). The South Dakota legislature has determined that punitive damages are to be awarded "for the sake of example, and by way of punishing the defendant." S.D. Codified Laws Ann. § 21–3–2. The Supreme Court of South Dakota has held that "[t]o accomplish the objective of punishing the wrongdoer and deterring others from similar wrongdoing, punitive damages must be relatively large." *Hulstein*, 293 N.W.2d at 892. "Punitive damages must not be oppressive or so large as to shock the sense of fair-minded men, but they may considerably exceed compensatory damages." *Id.* (citations omitted).

■ Under South Dakota law, the amount of an award of punitive damages rests largely within the discretion of the jury. *Hannahs v. Noah*, 83 S.D. 296, 158 N.W.2d 678, 683–84 (1968) (*Hannahs*); *see First National Bank of Minneapolis v. Kehn Ranch, Inc.*, 394 N.W.2d 709, 720 (S.D.1986) (*Kehn Ranch*) ("The jury's ver-

dict will not be set aside except in extreme cases where the jury has palpably mistaken the rules of law by which damages in a particular case are to be measured.") (citation omitted). However, the Supreme Court of South Dakota has reduced punitive damages awards. *See, e.g., Hannahs*, 158 N.W.2d at 684 (punitive damages award reduced from $2000 to $1000 because of defendant's good faith reliance on advice of counsel in interfering with plaintiff's farm action sale); *Stene v. Hillgren*, 98 N.W.2d 156, 159–60 (S.D.1959) (*Stene*) (punitive damages of $750 for assault and battery reduced to $250 where plaintiff received only a small cut and missed no work, and assault was not perpetrated in anger). "The allowance and amount of punitive damages turns on the particular facts of each case." *Hulstein*, 293 N.W.2d at 892. In determining whether a punitive damage award is excessive, South Dakota courts examine the following five factors: (1) the amount allowed in compensatory damages; (2) the nature and enormity of the wrong; (3) the intent of the wrongdoer; (4) the wrongdoer's financial condition; (5) all of the circumstances attendant to the wrongdoer's actions. *Wangen v. Knudson*, 428 N.W.2d 242, 246 (S.D.1988) (*Wangen*). The jury in the present case was explicitly instructed to consider these factors. *See* Instruction No. 11 (Trial II). We examine each of these factors in turn.

The first factor we examine is the amount of compensatory damages awarded in relation to the amount of punitive damages. In the present case, the jury awarded $100,000 compensatory damages and $2,000,000 punitive damages. Merrill Lynch points out that the ratio of punitive damages to compensatory damages is 20 to 1, a ratio much larger than most punitive

Lynch's costs of doing business. *See id.* Moreover, Merrill Lynch may have implicitly ratified Ulrich's churning through Edward Marks. *See* Restatement (Second) of Agency § 217C(d); Restatement (Second) of Torts § 909(d). Based on the *Olson* test, there can be little doubt that the Supreme Court of South Dakota would uphold the punitive damages award in the present case. It is clearly foreseeable that securities brokers will occasionally use their positions to misappropriate money.

20. Punitive damages are not available for violations of Section 10(b). *Nye v. Blyth Eastman Dillon & Co.*, 588 F.2d 1189, 1200 (8th Cir.1978). Consequently, the punitive damages award in this case attaches to Davis's state law claims of fraud and breach of fiduciary duty. The district court properly instructed the jury that it could award punitive damages only if it found Merrill Lynch liable for common law fraud or breach of fiduciary duty. Instruction No. 18 (Trial I).

damages awards upheld by the South Dakota Supreme Court. Merrill Lynch further points out that the $2,000,000 award is far in excess of the largest punitive damages award upheld by the state supreme court on appeal. *See Black v. Gardner,* 320 N.W.2d 153, 161 (S.D.1982) (*Black*) ($100,000). Davis responds that there is no precise mathematical ratio between compensatory and punitive damages, and the 20 to 1 ratio in this case is within the range of other punitive damages awards upheld in South Dakota.

 Although the ratio of compensatory to punitive damages in this case is admittedly higher than the ratios of most other punitive damages awards upheld in South Dakota, we believe that the 20 to 1 ratio is within the permissible range. The Supreme Court of South Dakota recently held that "[t]here is no precise mathematical ratio between compensatory and punitive damages." *Wangen,* 428 N.W.2d at 246. In *K & E Land & Cattle, Inc. v. Mayer,* 330 N.W.2d 529, 532 (S.D.1983) (*Mayer*), the Supreme Court of South Dakota upheld a $7000 punitive damages award when the compensatory damages were only $200, a ratio of 35 to 1. In *Hulstein,* 293 N.W.2d at 891, the court reinstated a punitive damages award of $50,000 when actual damages were $4,574.46, a ratio of 11 to 1. Moreover, the United States Supreme Court recently upheld a punitive damages award with a ratio of 117 to 1. *See Browning–Ferris Industries v. Kelco Disposal, Inc.,* — U.S. —, 109 S.Ct. 2909, 2913, 106 L.Ed.2d 219 (1989) (*Kelco*) ($51,146 compensatory damages and $6 million punitive damages award upheld).

We next examine the nature and enormity of the wrong committed. Merrill Lynch argues that the Davis account was profitable during the period it was churned and, in fact, outperformed the Dow Jones Industrial Index and exceeded the average rate of return for United States Treasury Bills. Merrill Lynch argues that the worst thing that happened as a result of the churning was that the Davis account was not as profitable as it might have been. We are unmoved by Merrill Lynch's argument, which effectively asks us to excuse a fraud because someone's profit rather than principal was churned. Through Ulrich, Merrill Lynch made either 106 or 141 unauthorized trades in the securities account of an elderly woman over a two and a half year period, earning nearly $50,000 in improper commissions. We find this churning to be a serious wrong, especially because Merrill Lynch knew that Mrs. Davis was unsophisticated in financial matters and totally relied upon and trusted her brokers. The gravity of the wrong committed by Merrill Lynch is not mitigated by the fact that the account was nevertheless profitable.

The third factor we assess is the intent of the wrongdoer. Merrill Lynch argues that if a wrongdoer exists in this case, it is Ulrich. Merrill Lynch contends that once it discovered that improper trading may have occurred, it promptly terminated Ulrich and notified the Davis family of possible problems in Mrs. Davis's account. Merrill Lynch asserts that there is no evidence that it engaged in any intentional, malicious, or deliberate wrongdoing, and that the $2,000,000 punitive damages award imposed under vicarious liability was excessive. In response, Davis argues that Merrill Lynch admitted responsibility for Ulrich's actions at trial and that the punitive damages were awarded on the basis of Merrill Lynch's failure to supervise as well as vicarious liability. We have already determined that the district court did not abuse its discretion in instructing the jury that under the law of South Dakota, any act or omission of an officer or employee within the scope of his or her employment is the act or omission of the corporation. *See infra* Section IV, B. Through Ulrich, Merrill Lynch committed the wrongful acts at issue over a substantial period of time. Officers of Merrill Lynch, particularly Marks, may have ratified these acts by failing to investigate the unusual increase in activity in the Davis account. Because Ulrich's wrongful intent is imputed to Merrill Lynch, we hold that there is sufficient evidence of intentional wrongdoing to support the punitive damages award.

We next evaluate the financial condition of the wrongdoer. Merrill Lynch does not deny that it is a large, profitable company capable of paying the punitive damages at issue, but contends that it should not be penalized for its financial success under the doctrine of vicarious liability. Davis argues that the large punitive damages award is justified in light of Merrill Lynch's size, and that the damages must be sufficiently large to make churning economically disadvantageous for Merrill Lynch. Davis also points out that the $2,000,000 punitive damages award represents only a small percentage of Merrill Lynch's net earnings in 1987 (the year the judgment was entered), and an even smaller percentage of Merrill Lynch's overall net worth.

The South Dakota Supreme Court has noted on several occasions that punitive damages must be relatively large to accomplish the objectives of punishing the wrongdoer and deterring others from similar misconduct. *See, e.g., Wangen,* 428 N.W.2d at 246; *Hulstein,* 293 N.W.2d at 892. The $2,000,000 punitive damages award represents less than three percent of Merrill Lynch's net earnings of $66,905,000 in 1987. Moreover, the $2,000,000 award represents less than one tenth of one percent of Merrill Lynch's net worth at the end of 1987.[21] In *Black,* 320 N.W.2d at 161, the South Dakota Supreme Court held that a punitive damages award which represented over 13.3 percent of the defendant's net worth was not excessive. While the punitive damages award in this case is indeed large, it is not excessive when examined in light of Merrill Lynch's net worth. *See Bankers Life & Casualty Co. v. Crenshaw,* 483 So.2d 254, 279 (Miss.1985) (Mississippi Supreme Court upholds a $1,600,000 punitive damages award and $20,000 in compensatory damages, reasoning that although the punitive damages seemed high, "it is difficult to imagine that ... the judicial conscience could be shocked by a puni-

tive damages assessment which is less than 1% of the financial net worth of the defendants"), *aff'd on other grounds,* 486 U.S. 71, 108 S.Ct. 1645, 100 L.Ed.2d 62 (1988).

Finally, we consider all of the circumstances attendant to the wrongdoer's actions, including any mitigating circumstances which may operate to reduce, but not defeat, the punitive damages award. Merrill Lynch again argues that the punitive damages award should be reversed or reduced because it promptly terminated Ulrich and notified his clients once it learned that improper trading may have occurred. We agree that Merrill Lynch acted promptly to mitigate further harm after another customer complained of an improper trade in his account in August 1984. Merrill Lynch also credited Mrs. Davis's account $8000 after it discovered that unauthorized trades were made. However, this does not excuse the dozens of unauthorized trades made over two and a half years or the thousands of dollars in improper commissions which Merrill Lynch earned. Moreover, Merrill Lynch undoubtedly argued to two juries that its remedial conduct should eliminate or reduce the amount of punitive damages. Both juries were unpersuaded by this argument, and we are unpersuaded that the jury's findings should be overturned.[22]

Having applied the five factors South Dakota courts examine to determine whether a punitive damages award is excessive, we are unconvinced that the punitive damages award "was given under passion, prejudice, or [was] clearly excessive." *Mayer,* 330 N.W.2d at 532. Although Merrill Lynch seeks to escape the consequences of its conduct by trying to affix the blame solely on Ulrich and by arguing that the account was nonetheless profitable, we hold that the punitive damages award was not excessive, and that this is not one of

---

**21.** Merrill Lynch's net worth as of December 25, 1987, was $2,103,828,000.

**22.** We are also mindful of the fact that two different South Dakota juries returned nearly identical punitive damages awards after being

properly instructed under South Dakota law. The fact that two different juries arrived at similar punitive damages awards is evidence that the award is not excessive or the result of passion or prejudice.

those unusual cases where the jury's damage award should be disturbed. *See Kehn Ranch*, 394 N.W.2d at 720.

### D. Due Process Challenge

Merrill Lynch next argues that the punitive damages award violates its due process rights under the fourteenth amendment of the United States Constitution.[23] Relying primarily on Justice O'Connor's opinion concurring in part and concurring in the judgment in *Bankers' Life & Casualty Co. v. Crenshaw*, 486 U.S. 71, 88, 108 S.Ct. 1645, 1655–56, 100 L.Ed.2d 62 (1988) (*Crenshaw*), Merrill Lynch contends that the due process clause protects defendants from punitive damages award resulting from "grant[s] of wholly standardless discretion [to the jury] to determine the severity of punishment." Merrill Lynch argues that the punitive damages award in this case violates due process because it confiscates a large amount of its property without procedural safeguards, while giving an extraordinary windfall to Davis. Merrill Lynch contends that under South Dakota law, the jury is given virtually complete discretion in deciding whether to assess punitive damages, as well as in determining the amount of any such award. Merrill Lynch further claims that the standards used to review punitive damages awards on appeal are also unconstitutionally imprecise. In response, Davis points out that to date, the Supreme Court has never scrutinized punitive damages awards under the due process clause. Davis further argues that even if punitive damages awards must satisfy due process, the jury in this case was not given "wholly standardless discretion" in deciding whether and in what amount punitive damages should be awarded.

■ We first note that Merrill Lynch bears the burden of proving that the South Dakota law governing punitive damages violates the due process clause. *Fein v. United States*, 730 F.2d 1211, 1213 (8th Cir.), *cert. denied*, 469 U.S. 858, 105 S.Ct. 188, 83 L.Ed.2d 121 (1984). Although the Supreme Court has never reviewed punitive damages awards under the due process clause, Merrill Lynch may well be correct in arguing that such awards must satisfy the strictures of due process. To date, five Supreme Court justices—Justices O'Connor, Brennan, Scalia, Marshall, and Stevens—have indicated in various opinions that the due process clause imposes some limits on the imposition of punitive damages in civil cases brought by private parties. *See Crenshaw*, 486 U.S. at 88, 108 S.Ct. at 1655–56 (O'Connor & Scalia, J.J., concurring in part and concurring in the judgment); *Kelco*, 109 S.Ct. at 2923 (1989) (Brennan & Marshall, J.J., concurring); *id.* at 2924 (O'Connor & Stevens, J.J., concurring in part and dissenting in part). The majority opinions in *Crenshaw* and *Kelco* did not address the due process issue because it was not properly raised below. *Crenshaw*, 486 U.S. at 76, 108 S.Ct. at 1649; *Kelco*, 109 S.Ct. at 2921. The Supreme Court has recently granted certiorari in *Pacific Mutual Life Insurance Co. v. Haslip*, 553 So.2d 537 (Ala.1989), *cert. granted*, —— U.S. ——, 110 S.Ct. 1780, 108 L.Ed.2d 782 (1990), a case presenting the issue of due process limits on punitive damages, and the Court will presumably issue an opinion on this issue next term.

■ Assuming without deciding that punitive damages awards must comply with due process, we can take guidance from *Crenshaw* and *Kelco* as to which types of punitive damages awards are likely to offend due process. In *Crenshaw*, Justice O'Connor wrote that punitive damages awards may violate due process when they result from the "grant of wholly standardless discretion [to the jury] to deter-

---

**23.** Merrill Lynch also initially argued that the punitive damages award violated the excessive fines clause of the eighth amendment, but withdrew this argument after *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, —— U.S. ——, 109 S.Ct. 2909, 2920, 106 L.Ed.2d 219 (1989), where the United States Supreme Court held that the excessive fines clause does not apply to punitive damages awards in cases between private parties.

mine the severity of punishment." 486 U.S. at 88, 108 S.Ct. at 1656. Justice O'Connor was also concerned with Mississippi's punitive damages scheme because the amount of punitive damages awarded is "a matter committed solely to the authority and discretion of the jury," *id.* (citation omitted), and thus apparently unreviewable. According to Justice O'Connor, when the jury is given standardless discretion, unpredictable and substantial windfall recoveries may result. *Id.* at 87, 108 S.Ct. at 1655. In *Kelco*, Justice Brennan was also concerned with unfettered jury discretion. Justice Brennan took issue with a jury instruction which instructed the jury that "[i]n determining the amount of punitive damages, you *may* take account of the character of the defendants, their financial standing, and the nature of their acts." 109 S.Ct. at 2923 (citation omitted) (emphasis added). Justice Brennan noted that due process problems are created by punitive damages "imposed by juries guided by little more than an admonition to do what they think is best." *Id.*

Applying the concerns expressed by Justice O'Connor in *Crenshaw* and Justice Brennan in *Kelco*, it is clear that neither South Dakota's punitive damages scheme nor the punitive damages award in this case offend due process. The statutes and case law of South Dakota limit the jury's discretion when deciding whether to impose punitive damages at all and in determining the amount of punitive damages to award. S.D. Codified Laws Ann. § 21-3-2 limits the award of punitive damages to cases not arising from contract "where the defendant has been guilty of oppression, fraud or malice," or cases of wrongful injury to animals when "committed intentionally or by willful and wanton misconduct, in disregard of humanity." [24] Moreover, unlike *Crenshaw* and *Kelco*, South Dakota juries must consider specific factors when fixing the amount of any punitive damages they impose. The Supreme Court of South Dakota has consistently held that the following five factors must be considered by the jury when determining the proper amount of punitive damages: (1) the amount allowed in compensatory damages; (2) the nature and enormity of the wrong; (3) the intent of the wrongdoer; (4) the wrongdoer's financial condition; and (5) all of the circumstances attendant to the wrongdoer's actions, including any mitigating circumstances which may operate to reduce, but not defeat, the punitive damages award. *See, e.g., Gross v. Kouf*, 349 N.W.2d 652, 654 (S.D.1984); *Black*, 320 N.W.2d at 161; *Hulstein*, 293 N.W.2d at 892; *Baumgartner's Electric Construction Co. v. De Vries*, 77 S.D. 273, 91 N.W.2d 663, 674 (1958) (subsequent history omitted). Moreover, unlike the punitive damages award at issue in *Crenshaw*, a jury's punitive damages award in South Dakota is subject to review by the trial court and the state supreme court. In fact, "[t]he trial court has wide discretion in granting a new trial based upon excessive damages." *Hulstein*, 293 N.W.2d at 891. The state supreme court also reviews punitive damages awards for excessiveness, and has in fact reduced the size of punitive damages awards. *See Hannahs*, 158 N.W.2d at 683–84; *Stene*, 98 N.W.2d at 159–60. When reviewing punitive damages awards, South Dakota courts independently apply the five factors juries are required to apply, reversing or reducing awards when they were "given under passion, prejudice, or [are] clearly excessive." *Mayer*, 330 N.W.2d at 532.

In short, South Dakota juries are not given "standardless discretion," *Crenshaw*,

---

**24.** S.D. Codified Laws Ann. § 21-3-2 provides in full:

**Punitive damages in discretion of jury.** In any action for the breach of an obligation not arising from contract, where the defendant has been guilty of oppression, fraud, or malice, actual or presumed, or in any case of wrongful injury to animals, being subjects of property, committed intentionally or by willful and wanton misconduct, in disregard of humanity, the jury, in addition to the actual damage, may give damages for the sake of example, and by way of punishing the defendant.

486 U.S. at 88, 108 S.Ct. at 1655–56, "to do what they think is best." *Kelco*, 109 S.Ct. at 2923. Juries may award punitive damages in only certain types of cases, and several objective factors must be considered in determining the amount awarded, including the ratio of punitive damages to compensatory damages. Punitive damages awards are reviewable by the trial court and on appeal. While broad, the discretion of South Dakota juries is not unfettered:

> The discretion of the jury, however, is not an arbitrary or unlimited one. They are not at liberty to award by way of punitive damages any amount regardless of how large it may be. Their verdict in this regard is subject to supervision and revision by the court to the same extent that an award of compensatory damages is.

*Stene*, 98 N.W.2d at 159 (citation omitted). We hold that the South Dakota punitive damages scheme, with its explicit standards and its judicial review of jury awards, sufficiently constrains the jury's discretion and satisfies the dictates of due process.

■ Having determined that the South Dakota punitive damages scheme satisfies due process, we now examine whether Merrill Lynch received due process on the puni-tive damages issue in this case. We have little trouble in concluding that the jury's discretion was properly guided by the district court. First, both juries were properly instructed that they may, but were not required, to award punitive damages, and that if they determined punitive damages were proper, that they were required to weigh the appropriate factors in determining the amount of punitive damages. *See* Instruction No. 18 (Trial I); Instruction No. 11 (Trial II).[25] Secondly, the district court in fact exercised its discretion to reduce the punitive damages award after the first trial, ordering a remittitur of the punitive damages award from $2,250,000 to $400,-000, or a new trial on damages if Davis refused the remittitur. Davis refused the remittitur and a new trial on damages was held, where a new jury found $2,000,000 in punitive damages, an amount nearly identical to that awarded after the first trial. Finally, we have independently reviewed the punitive damages award on appeal by applying the five factors the jury and district court considered, *see infra* Section IV, C, and have concluded that, while the award is indeed large, it is not excessive.[26]

Accordingly, assuming but not deciding that the due process clause constrains the imposition of punitive damages in civil cases brought by private parties, we hold

**25.** For example, Instruction No. 18 (Trial I) provides in relevant part as follows:

> One who has suffered loss to her property through the fraud of another may recover, in addition to his actual damage, damages for the sake of example and by way of punishing such other party.... If you find that punitive damages should be allowed, then in determining the amount, you should consider all of the attendant circumstances, including the nature, extent and enormity of the wrong, and intent of the party committing it, the amount allowed as actual damages, and, generally, all of the circumstances attending the particular acts or acts involved, including any mitigating circumstances which may operate to reduce without wholly defeating punitive damages.

**26.** We disagree with Merrill Lynch's contention that South Dakota law did not give it notice that a tort which caused no out-of-pocket losses could result in a $2,000,000 punitive damages award. First, it is simply not true that there are no compensatory damages in this case. Under the churning damage standard adopted by this circuit in *McGinn v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 736 F.2d 1254, 1257 (8th Cir.1984), Davis sustained between $93,000 and $107,341.15 in out-of-pocket losses. *See infra* Section III. Secondly, while the total dollar amount of the punitive damages award is the largest to date in South Dakota, state law accorded Merrill Lynch sufficient notice that a tort could result in punitive damages many times greater than the amount of actual damages and could require payment of a substantial portion of the defendant's net worth. *See K & E Land & Cattle, Inc. v. Mayer*, 330 N.W.2d 529, 532 (S.D.1983) (punitive damages 35 times compensatory damages upheld); *Black v. Gardner*, 320 N.W.2d 153, 161 (S.D.1982) (punitive damages representing 13.3 percent of defendant's net worth upheld); *Hulstein v. Meilman Food Indus., Inc.*, 293 N.W.2d 889, 892 (S.D.1980) (punitive damages 11 times greater than compensatory damages upheld).

that South Dakota's punitive damage scheme meets the requirements of due process because it sufficiently guides the jury's discretion and permits judicial review of any punitive damages awarded. We further hold that Merrill Lynch received the due process benefits of South Dakota's punitive damages scheme in this case, and the $2,000,000 punitive damages award does not violate due process.

## V. Cross–Appeal: Remittitur

Having decided that none of Merrill Lynch's claims merit reversal, we now consider Davis's cross-appeal. Davis argues generally that the district court abused its discretion in granting Merrill Lynch's motion for a remittitur after the first trial.[27] Merrill Lynch responds that the district court has broad discretion to reduce a jury award and that Davis has failed to identify how the district court abused its discretion.

Davis's cross-appeal lacks merit. An order granting remittitur will not be disturbed on appeal absent an abuse of discretion. *Herold v. Burlington Northern, Inc.*, 838 F.2d 296, 297 (8th Cir.) (*Herold*) (per curiam) (district court order reducing $2,000,000 compensatory damage award to $300,000 by remittitur affirmed), *cert. denied*, 488 U.S. 825, 109 S.Ct. 74, 102 L.Ed.2d 50 (1988); *Ouachita National Bank v. Tosco Corp.*, 716 F.2d 485, 488 (8th Cir.1983). We give the trial court's determination of a reasonable limit to a jury award considerable deference on review. *Herold*, 838 F.2d at 297. Davis fails to present any reason why we should not defer to the judgment of the district court, which "had the opportunity to observe the proceedings and the evidence." *Id.* In fact, Davis fails to even articulate how the district court allegedly abused its discretion in granting remittitur. We hold that the district court did not abuse its discretion in ordering a remittitur after the first trial.

## CONCLUSION

To summarize, we hold that the district court did not err in (1) instructing the jury on the elements necessary to establish liability under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1988), common law fraud, and breach of fiduciary duty; (2) instructing the jury on the proper elements of compensatory damages in churning cases; (3) instructing the jury on the award of punitive damages; and (4) instructing the jury that Merrill Lynch could be held liable for punitive damages based on the acts or omissions of its employees acting within the scope of their employment. We further hold that the punitive damages award in this case was not excessive and, assuming the imposition of punitive damages in private civil cases must satisfy due process, that South Dakota's punitive damages scheme affords sufficient due process to defendants and there was no due process violation in this case. Finally, we hold that the district court did not abuse its discretion in ordering a remittitur after the first trial. Accordingly, the judgment of the district court is

AFFIRMED.

---

**27.** After the first trial, the jury awarded Davis $20,000 compensatory damages and $2,250,000 punitive damages. The ratio of punitive damages to compensatory damages in this award was 112.5 to 1. In comparison, the ratio between the second jury's award of $100,000 compensatory damages and $2,000,000 punitive damages was 20 to 1. The district court ordered a remittitur of the punitive damages to $400,000, or, if Davis refused to accept the remittitur, a new trial on the damages issue only. Davis refused the remittitur and a new trial on damages was held.