ELDRIDGE, Plaintiff v.

NORTHWEST G. F. MUTUAL INSURANCE COMPANY,
Defendant

(221 N.W.2d 16)

(File No. 11287. Opinion filed August 28, 1974)

Roland E. Grosshans, Hot Springs, for plaintiff-respondent.

Lakeman & Krause, Mobridge, for defendant-appellant.

WOLLMAN, Justice.

This is an appeal by Northwest G. F. Mutual Insurance Company, defendant, from a judgment in the amount of $407 based upon a jury verdict in that amount, and in the amount of $1,500 for attorney's fees based upon an award by the court pursuant to SDCL 58-12-3 following trial, in favor of Dr. David Eldridge, plaintiff.

In March of 1966, plaintiff, a medical doctor employed by the United States Veterans Administration at Hot Springs, South Dakota, purchased what was described as a double wide trailer or mobile home. After purchasing the home, plaintiff communicated with a Mr. Boekhout, an insurange agent, concerning insurance coverage on the home. Mr. Boekhout wrote a policy of insurance on the home on behalf of defendant company.

On January 9, 1972, the roof of the home suffered damage as the result of high winds. Plaintiff reported the damage to Mr. Boekhout, who later came to plaintiff's office and helped plaintiff prepare a loss report, which Mr. Boekhout then sent to defendant. Defendant assigned the investigation of the claim to the Rapid City, South Dakota, office of General Adjustment Bureau, a firm that adjusts insurance losses for various insurance companies who retain the firm's services.

Following the damage to the roof, plaintiff placed rocks and old automobile tires on the roof in an attempt to prevent further wind damage to the plastic roofing material pending an adjustment of the loss and a completion of the repairs.

On February 11, 1972, E. L. "Bud" Engler, an adjuster employed by General Adjustment Bureau, accompanied by George Sigafoos, a Hot Springs building contractor, inspected the damage to plaintiff's home. Based upon his discussion with Mr. Sigafoos, Mr. Engler concluded that the damage to the roof, which was covered by a plastic or vinyl type of covering not usually found on mobile homes, could be repaired by installing a metal ridge roll the length of the roof. Plaintiff was not present at the time Mr. Engler and Mr. Sigafoos inspected the damage. Later that day plaintiff signed a proof of loss statement that had been prepared by Mr. Engler showing $166.50 as the amount claimed.

Plaintiff testified that he was under the assumption that defendant would undertake to have the roof repaired following Mr. Engler's inspection visit, plaintiff claiming unfamiliarity with matters of this nature. Several weeks after Mr. Engler's inspection visit, further damage was done to the roof in a second windstorm. Plaintiff called Mr. Boekhout several times about this additional damage and was informed that Mr. Boekhout would expedite the matter by calling in the information to the company and that someone would be out to inspect the additional damage.

Meanwhile, on February 23, 1972, defendant issued its check in the amount of $166.50 payable to plaintiff and a local bank. Upon receiving the check, plaintiff called an officer of the bank and told him that he wasn't exactly sure what he had signed. Plaintiff was informed by the bank officer to file a second claim. Plaintiff then called Mr. Boekhout, who advised plaintiff not to cash the check but to hold on to it and file another claim. Plaintiff talked with Mr. Boekhout several times on the phone about the matter but heard nothing further from anyone concerning the second claim. After waiting approximately two weeks after filing the second claim, plaintiff decided to take action to have the roof repaired inasmuch as water from melting snow was dripping through the ceiling panels into the home. Plaintiff called three local contractors, including Mr. Sigafoos, for information about the cost of making suitable repairs to the roof. Plaintiff told Mr. Sigafoos that he believed that because the entire roof covering was loose, putting a metal strip down the center of the roof as originally contemplated by Mr. Engler and Mr.

Sigafoos would act as a straight edge and shear off the roof material when it was lifted by the wind. Plaintiff got the impression from his conversation with Mr. Sigafoos that Mr. Sigafoos had not really comprehended the extent of the damage at the time he and Mr. Engler inspected the roof and that he agreed that putting down a metal strip might act as a straight edge and damage the roof further. Plaintiff testified that Mr. Sigafoos then discussed other types of roofing with him, including a hot tar and gravel roof, which would have been rather expensive because of the need of first stripping off the old roofing, and then what was described as a double overlap or "shelv" edge roof, on which Mr. Sigafoos quoted a price of about $30 a square. There was some discussion about using shingles, but Mr. Sigafoos thought that that would be impractical because they would be too heavy for the low pitch on the roof.

Plaintiff obtained a bid from Mr. Rahn, a local contractor, of $26 per square for installing the double overlap type of roofing material. The third contractor whom plaintiff contacted indicated that this would be a fair price for installing that type of roofing. It appears that all three contractors indicated that this would be the most economical type of roofing to use to repair the damage.

Mr. Rahn then installed double overlap roofing on the home sometime in March of 1972 for a total cost of $407. He testified that in his opinion this was the cheapest type of roofing material available in the area that would provide a suitable covering for the home. He testified that although the double overlap material was better material than that originally on the roof, there was no plastic type roof covering available to him similar to that which was originally put on the home.

During this time Mr. Boekhout informed defendant that plaintiff was not satisfied with the original adjustment and that he claimed to have more damage than was originally allowed. On March 21, 1972, defendant's secretary informed Mr. Engler by letter that plaintiff would not accept the check for $166.50, and that he claimed to have considerably more damage than was allowed under the adjustment. The letter concluded as follows:

"Please review your file on this and if you believe that you may have made an error in the adjustment please make a supplementary adjustment and submit same to us. If you believe that your adjustment was correct, then please inform us and we shall then inform Dr. Eldridge that no further allowance will be made."

Mr. Engler called plaintiff at his office and said that he understood plaintiff was unhappy with the adjustment, to which plaintiff replied in the affirmative. Plaintiff testified that Mr. Engler then said, "I've been in Arizona for a couple weeks, I couldn't get down, but I'll go back to the Company and see if I can get you another hundred dollars." On April 14, 1972, Mr. Engler reported to defendant by letter that on the previous day he had been in Hot Springs and had talked to Mr. Boekhout and to plaintiff. He then summarized the results of the inspection that he and Mr. Sigafoos had made on February 11, 1972, and repeated his conclusion that they had decided that the plaintiff was not entitled to replace or recover the entire roof. The report continued as follows:

"* * * Apparently the roof continued to leak after the claim was adjusted, so the insured, Dr. Eldridge, called another local contractor, Clare Rahn, and made arrangements to have him install a new salvage edge which is a double cover composition, mineral surfaced roofing over the entire trailer at a cost of $407.00. I do not feel that the insurance carrier should be called upon to pay for the new roofing. After all, the trailer home is six to eight years old and there would be depreciation to be considered even in the event that the wind or hail damaged the plastic roofing material badly enough to require replacement."

The report then concluded as follows:

"I contacted both contractors separately yesterday in Hot Springs and asked them frankly if they felt that any damage from wind or hail would have required replacement of the entire roof with salvage edge roofing and they were quite frank in indicating that the insurance

should not be involved in cost of replacing the roofing since proper allowance had already been made in the original adjustment. This insured, Dr. Eldridge, works for the VA and he undoubtedly will be quite demanding. While I doubt that any attorney would take on the case, it is possible that he will write the Insurance Commissioner's office at Pierre and cause more trouble. However, I frankly feel that the original adjustment was more than fair and I do not feel that he is entitled to the cost of recovering the mobile home with a superior type of roofing to that which he had on in the first place. The two contractors in Hot Springs agree with my ideas.

"I trust this information will enable you to close out the file."

On April 18, 1972, defendant's secretary wrote to plaintiff and informed him that the company had asked the adjustor to reconsider the adjustment, that the adjustor had consulted with two contractors, who agreed that defendant had paid a proper amount, and that defendant intended to abide by the adjustment of $166.50 as made and paid to plaintiff.

Plaintiff then contacted counsel, who wrote to defendant's secretary on April 28, 1972, returning the check for $166.50 and informing defendant that plaintiff refused to accept this amount as settlement. Counsel enclosed a copy of the repair bill paid by plaintiff in the amount of $407, informed defendant that he had advised plaintiff that defendant's refusal to honor plaintiff's claim had been vexatious and wrongful, and made demand upon plaintiff for payment in the amount of $434.71, which included the repair bill in the amount of $407, together with interest on that amount for one month in the amount of $2.71, plus an attorney's fee in the amount of $25.00.

On May 10, 1972, defendant's secretary wrote to plaintiff acknowledging receipt of counsel's letter and enclosing a copy of a portion of the report that had been submitted to defendant by Mr. Engler. The letter concluded as follows:

"After considering the above information you may let us know if our check in the amount of $166.50 will be satisfactory to you and we will then return same to you. If not satisfactory to you then you may proceed with litigation."

Plaintiff proceeded with litigation and recovered the judgment described above.

■ Defendant contends that the court's instructions on the measure of damages were improper and prejudicial to defendant, claiming that the instructions did not inform the jury that under the terms of the policy defendant retained the right to figure depreciation on any item that needed to be replaced as a result of loss or damage covered under the policy. Defendant failed to propose any instruction with respect to the matter of depreciation, however, and cannot now predicate error on the court's failure to so instruct. SDCL 15-6-51(a); Ross v. Foss, 77 S.D. 358, 92 N.W.2d 147. [1]

■ Defendant contends that the verdict rendered by the jury was excessive. Defendant moved for a directed verdict at the close of all the evidence on the grounds that reasonable men could only conclude that the actual damage to plaintiff was in the amount of $166.50; that plaintiff had failed to prove by a preponderance of the evidence that he had suffered damage under the policy provisions in the amount of $407; and that because of the policy provisions plaintiff was not entitled to a new roof. We conclude that the trial court did not err in not directing that plaintiff could recover only the amount of $166.50. The only questions presented on review of the denial of a motion for a directed verdict are those specifically pointed out as grounds for the motion. Lang v. Burns, 77 S.D. 626, 97 N.W.2d 863. There was sufficient evidence to present a jury question on the amount of damages plaintiff had suffered. Defendant's general objection "* * * that because of the policy provisions he is not entitled to the new roof for the $407.00 * * *," did not present a proper ground for a directed verdict. Defendant made no motion for judgment notwithstanding the verdict or for a new trial.

---

1. Present counsel for defendant did not represent defendant during any of the pretrial or trial proceedings.

Defendant complains of other alleged errors in the instructions and in certain of the trial proceedings. We have concluded that these contentions are without merit and consequently we do not discuss them in detail.

Defendant argues that the trial court erred in allowing plaintiff judgment for attorney's fees under SDCL 58-12-3, which provides in part:

"In all actions or proceedings hereafter commenced against any insurance company, * * * if it appears from the evidence that such company * * * has refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause, * * * the trial court and the appellate court, shall, if judgment * * * is rendered for plaintiff, allow the plaintiff a reasonable sum as an attorney's fee to be recovered and collected as a part of the costs, * * *"

After the completion of the jury trial in the instant case, the trial court held a hearing on the matter of the award of attorney's fees at which he received the affidavit of plaintiff's counsel setting forth a claim for attorney's fees and out-of-pocket expenses totaling $1,686.84, together with certain exhibits submitted by plaintiff and by defendant consisting of the several letters and reports from Mr. Engler, plaintiff's counsel and defendant's secretary as already described above.

The trial court found, among other things, that the investigation and adjustment of plaintiff's claim by defendant's agent was incomplete and insufficient and that the refusal of defendant to pay the whole amount of plaintiff's loss was vexatious or without reasonable cause. The court concluded that plaintiff was entitled to $1,500 as an attorney's fee.

We think that the evidence was sufficient to justify the trial court's finding that defendant's failure to pay the full amount of plaintiff's loss was vexatious or without reasonable cause. As was stated in Tracy v. T & B Const. Co., 85 S.D. 337, 182 N.W.2d 320:

> "The question of whether an insurer's refusal to pay is vexatious or without reasonable cause is necessarily one of fact and whether attorney's fees are to be allowed must depend on the facts and circumstances of each particular case.   *   *   *" 182 N.W.2d 320, 323.

See also Wilson v. Allstate Ins. Co., 85 S.D. 553, 186 N.W.2d 879; Luke v. American Family Mutual Ins. Co., 8 Cir., 476 F.2d 1015. It is undisputed that defendant's adjustor did not make a personal investigation of the damage to the roof that occurred after his inspection on February 11, 1972. Mr. Engler's report to the company that he had discussed the matter with Mr. Rahn and had been told by Mr. Rahn that "the insurance should not be involved in cost of replacing the roofing since proper allowance had already been made in the original adjustment   *   *   *," was belied by Mr. Rahn's testimony that, "The only thing I told him was that I thought we probably had a little better roof put on there than what was originally on, but I put on what I felt it would take to hold it." Because Mr. Sigafoos testified that he did not go back out to plaintiff's home after the inspection that he and Mr. Engler made on February 11, 1972, any opinion he may have had concerning the necessity of repairs would clearly have been limited to the damage he observed prior to the second windstorm.

■ The trial court was correct in finding that defendant had made an inadequate investigation of plaintiff's loss. We conclude that defendant failed in its duty to conduct a good-faith investigation of plaintiff's claim and that as a result defendant's refusal to pay the full amount of plaintiff's loss was without reasonable cause. Brown v. Continental Casualty Company, 209 Kan. 632, 498 P.2d 26.

■ Defendant argues that it should not be held liable for attorney's fees under SDCL 58-12-3 because it had engaged a reputable independent adjusting firm to investigate and adjust the loss. We do not believe that defendant can insulate itself from liability by delegating its responsibility to investigate claim losses to third parties. While we do not question defendant's good faith in assigning the claim to the independent insurance adjusting firm

for investigation and report, ultimately the liability for the adjusting firm's failure to make an adequate investigation of plaintiff's claim of additional damage must rest upon defendant.

We have considered the authorities cited by defendant, including the case of Bloom v. Northern Pacific Beneficial Association, N.D., 193 N.W.2d 244, in connection with defendant's argument that to permit defendant to recover attorney's fees in the instant case would be to deny defendant and other insurance companies the opportunity to defend in good faith against what it considers unreasonable, unfounded claims by policyholders.

We do not mean to imply in any way that an insurance company ipso facto subjects itself to liability for attorney's fees under SDCL 58-12-3 by reason of refusing to pay a claim by a policyholder, no matter how unfounded or unreasonable such claim may appear to be. We emphasize the fact that our holding is based upon the fact that there was no adequate, good faith investigation of plaintiff's claim of additional storm damage to his home. If anything, the record reveals a lackadaisical, if not an outright cavalier, attitude on the part of the adjustor. Certainly the claim was not processed by the adjustor with that degree of speed and attention that one paying a premium for property insurance could fairly expect to receive.

Finally, defendant claims that the amount of attorney's fees allowed is excessive, arguing that plaintiff should not be awarded more attorney's fees in this type of an action than he would normally pay to his privately retained counsel for handling the same type of lawsuit in a case where there would be no expectation of an award of attorney's fees. On the other hand, counsel for plaintiff has asked that we award additional attorney's fees in the amount of $3,164.00 for proceedings on appeal.

Without going into an extended discussion of the reasonableness of the fees awarded for the trial of the case, we do note that as a part of his preparation for trial plaintiff's counsel was required to travel to Eureka, South Dakota, a round trip of some 682 miles, to attend a deposition noticed by defendant's then

attorney. We were informed by plaintiff's counsel during oral argument, and the record would support this statement, that in fact no deposition was actually taken; rather, defendant's counsel merely asked plaintiff's counsel to stipulate as to certain matters regarding introduction of certain exhibits and as to the relationship between defendant and General Adjustment Bureau of Rapid City. For all that appears from the record, it is not clear why these stipulations, which consist of some four double-spaced, typewritten pages, could not have been as effectively procured through correspondence, requests for admissions or other means. We note that the plaintiff furnished answers to certain interrogatories submitted by defendant.

Upon considering the entire record, including the fact that the trial was concluded in one day, we are of the opinion that the award of $2,000 attorney's fees is sufficient to cover both the representation in the trial and for the proceedings in this appeal. The judgment for attorney's fees will be modified accordingly.

The judgment as modified is affirmed.

BIEGELMEIER, C. J., and WINANS, J., concur.

DOYLE and DUNN, JJ., concur specially.

DOYLE, Justice (concurring specially).

I affirm the judgment of the trial court. However, in my opinion the record supports an award of attorney's fees totaling $2,500.00.

I am authorized to state that Justice DUNN agrees with this concurrence.