Edward SCHAFFER, Jack Ehrich
and June Ehrich, Plaintiffs
and Appellees,

v.

EDWARD D. JONES & CO., Defendant
and Appellant,

and

Bill Edwards and Marv Tebben,
Defendants.

Nos. 18085, 18100.

Supreme Court of South Dakota.

Argued Oct. 5, 1993.

Decided Sept. 14, 1994.

Michael J. Schaffer and Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for plaintiffs and appellees.

Robert D. Hofer of Riter, Mayer, Hofer, Wattier & Brown, Pierre, and Bruce C. Oetter and Helen Paulin Gab, St. Louis, MO, for defendants and appellants.

AMUNDSON, Justice.

Edward D. Jones & Co. appeals a judgment entered by the trial court after a jury verdict for Edward G. Schaffer, Jack Ehrich and his wife, June Ehrich, on claims of fraud, deceit, and misrepresentation. We affirm in part, reverse in part and remand.

## FACTS

Jones is a large brokerage firm headquartered in St. Louis, Missouri, with numerous branch offices throughout the nation, including many in South Dakota. In 1980, Jack and June Ehrich (Ehrichs) began investing with Edward D. Jones & Co. (Jones) through broker Marv Tebben (Tebben) of Aberdeen, South Dakota. Prior to that time, Ehrichs invested their savings in bank CDs, bonds, and with the Aid Association for Lutherans. Jack Ehrich has an eighth-grade education and was a sixty-two year old farmer at the time of trial. His wife, June, has a high school education and is a housewife. June handled most of the business with Jones through Tebben.

In 1981, Edward G. Schaffer (Schaffer), another Plaintiff, began investing with Jones through broker Bill Edwards (Edwards) of Aberdeen. Until that time, Schaffer primarily invested in bank savings accounts and Cds. Schaffer has an eighth-grade education and has farmed all of his life. At the time of trial, he was seventy years old and retired.

During approximately a decade of investing with Jones, Ehrichs and Schaffer experienced considerable financial success in over forty different security investments. According to Jones' records, Ehrichs' investments earned approximately $196,916.10, while Schaffer enjoyed earnings of approximately $55,931.87.

Ehrichs informed Tebben that they were conservative investors, interested in safe, low-risk investments. Tebben sold a $10,000 debenture of D.H. Baldwin Company (Baldwin) to Ehrichs over the telephone on December 27, 1982.[1] Tebben represented to June that Baldwin returned thirteen and one-half percent interest and the interest would double in five years if left to compound.

Prior to selling Ehrichs the Baldwin debenture, Jones had substantial internal information which seriously questioned the soundness of Baldwin investments. In a May 1982 financial review, a Jones principal indicated that Baldwin had a negative net worth.

---

1. In total, Jones underwrote $100 million dollars in Baldwin debentures and received approximately $5 million dollars in commissions and fees. This was the largest bond underwriting that Jones had ever handled.

Jones also received a report criticizing Baldwin's finances as: "An operating and net cash flow that continues to decline ... matched with a staggering debt load. In our opinion, this combination produces unjustifiable investment risks." This information was not provided to Ehrichs before their investment.

Before Ehrichs' purchase, *Forbes* magazine printed an article disclosing serious problems with Baldwin's financial condition. After receiving this information, Tebben contacted Jones' headquarters and was told that the information in the article was incorrect. Relying on this information, Tebben did not disclose the article to Ehrichs. Ehrichs testified that they would not have purchased the Baldwin debentures had they been advised of this financial information.

When offering securities, Jones provides its brokers with "blue sheets" on each security. These "blue sheets" contain important information about investments. Tebben relied on the "blue sheets" which showed Baldwin was financially sound. The "blue sheet" on Baldwin claimed the company had $7.7 billion dollars in assets and $2 billion dollars in cash. However, Jones' own documents showed Baldwin had a negative tangible net worth. The "blue sheet" showed Baldwin stock was rated "A" but omitted any reference to the "BBB−" rating on the debentures sold to Ehrichs.[2] This information was not disclosed to Ehrichs. Although Jones knew Baldwin's Value Line safety rating was 4, this too was not disclosed when Ehrichs purchased the Baldwin debenture.[3]

At a Farmers Union Convention in March 1983, Ehrichs listened to a presentation by the president of Baldwin United. The president told the audience the company was encountering financial difficulties. Upon returning from the convention, Ehrichs read a newspaper article which explained Baldwin was in financial trouble. June then contacted Tebben so their Baldwin investment could be sold. Tebben reassured June that Baldwin investment was sound and recommended Ehrichs keep their investment with Baldwin. Tebben based his assurances on information he received from Jones. Ehrichs did not sell the Baldwin debenture because of Tebben's representations. Evidence shows that if they had, most of their investment would have been returned. Approximately six months later, Baldwin filed bankruptcy. At trial, Jones' records indicated Ehrichs' $10,000.00 Baldwin investment had a disposition value of $2,353.63.

Tebben also sold Ehrichs a $5,000.00 interest in Natural Resource Management (NRM) in May 1983. This sale was consummated over the telephone. NRM is an oil and gas income limited partnership investment.[4] Tebben represented the investment as low risk and would return fifteen percent annual interest. He explained the investment could be sold after two or three years and, as farmers who use a lot of oil and gas, it was something in which they should invest. Ehrichs never received a prospectus on the NRM investment and Tebben never disclosed his commissions. According to Jones' records, Ehrichs' $5,000.00 NRM investment had a disposition value of $6.24 at the time of trial.

In September 1983, Edwards sold Schaffer a $15,000.00 investment in NRM over the telephone. Edwards told Schaffer NRM was a low-risk investment and the price of oil should keep going up because of problems in the Middle East. Schaffer was also told to expect fifteen percent annual interest for two years and maybe more in the future.

After purchasing the limited partnership interest, Schaffer received a brochure indi-

---

**2.** At trial, a former Jones broker testified that these were "junk bonds."

**3.** A Value Line rating of 1 is the highest, most safe; a rating of 5 is least safe.

**4.** The training manual used by Jones to train new brokers described the risks of oil and gas limited partnerships as follows: "Although the upside potential can be tremendous, there is an even greater possibility that an investor in a limited partnership can lose his entire investment." Despite this instruction, Jones represented NRM as a low-risk investment.

cating the NRM investment was safe as a bond and a low-risk conservative investment. Schaffer also received a prospectus which he attempted to read but found difficult to understand. Schaffer thought the commissions were high and the investment was riskier than Edwards had represented. When Schaffer asked Edwards to sell the NRM investment, Edwards informed him the investment could not be sold because it was a limited partnership. Schaffer received approximately fifteen percent return on his investment for about one and one-half years before the distribution began decreasing. The limited partnership was eventually rolled into a master-limited partnership and then converted into a stock called Edisto. As of June 1, 1992, Schaffer's $15,000.00 investment was worth $16.50.

Jones was the principal and primary brokerage firm selling the NRM limited partnership interests. In January 1983, Jones, through an affiliated subsidiary, purchased a one-third ownership interest in NRM Corporation. Jones paid $5 million dollars for its ownership interest in NRM, consisting of $1 million dollars in cash and a $4 million dollar promissory note.

During July 1983, Jones sent its own employees to NRM headquarters as part of a due diligence investigation required by the Securities & Exchange Commission. After inspecting NRM's finances, these employees drafted a memorandum which stated: "[T]his is a highly leveraged company. This high degree of leverage manifests itself in an unacceptable absence of liquidity and a capital structure with a severe inability to withstand any potential negative business development. This situation is especially disturbing for a company on the risky end of an unpredict-

able oil industry." The memorandum also indicated NRM had a $2 million dollar collateral shortfall due in October 1983 with "no intentions, or ability, to actually repay" debt without borrowing additional funds. This memorandum was never disclosed to Jones' brokers or clients.

In selling these limited partnerships, Jones represented that Schaffer and Ehrichs would receive a fifteen percent return. This representation occurred even though Jones was aware NRM's overhead exceeded its revenues by $700,000.00 per month. NRM invested the money raised from investors in CDs and T-bills at interest rates well below the fifteen percent promised investors. Jones' own review of NRM's financial condition disclosed that NRM was having difficulty meeting the fifteen percent return.[5] In fact, in the July memorandum, Jones suggested legal counsel review "a possible bankruptcy of the general partner on the individual limited partnership and their investors."

By March 1985, the promised fifteen percent distribution had decreased and the value of the partnerships began falling as well. In November 1985, Jones sold its interest in NRM but did not advise its clients to do the same. The oil market collapsed between January and March 1986. By that time Jones had sold its interest in NRM, but its customers, including Schaffer and Ehrichs, were still holding a financial interest in the company.

In total, Jones sold approximately $160 million dollars of these NRM limited partnership interests and collected about $20 million dollars in commissions and fees from these sales.

After these investments proved less than conservative, Ehrichs and Schaffer brought

---

5. Exhibit 120, a Jones internal memorandum, states:

The initial shortfall in investment income is paid to the investors through a partial return of their capital. At the time of investment in properties the partnerships then borrow an amount equal to the capital returned prematurely so as to have money equal to the original capital raised for the purchase of reserves. This leveraging of the partnerships continues even after all money is invested in reserves so long as the return on

the reserves, due to a variety of production curves, falls below 15%.

Although excellent for sales, it seems to us that the 15% return is *setting up the investor for a disappointment down the road.* By starting the investors off with an attractive [unintelligible] and by leveraging of the partnerships, NRM increases the likelih [unintelligible] the investors will be disappointed rather than pleasantly surprised [unintelligible] declines at some point in the future. (Emphasis in original.)

an action against Jones to recover their investment on claims of fraud, deceit, intentional misrepresentation and negligent misrepresentation. A jury trial was held and the jury unanimously returned verdicts awarding Schaffer compensatory damages of $25,000.00 and punitive damages of $500,000.00 and awarding Ehrichs compensatory damages of $24,500.00 and punitive damages of $500,000.00. The jury also awarded $10,000.00 in punitive damages against Edwards and $8,500.00 in punitive damages against Tebben. Defendants filed motions for judgment notwithstanding the verdict and alternatively for a new trial. The court denied these motions with respect to Jones, but granted a motion to strike the punitive damage awards against the individual defendants Edwards and Tebben. Both parties appeal.

## ISSUES RAISED BY APPELLANT JONES

1. Was evidence of the plaintiffs' other profitable investments with the defendants improperly excluded?

2. Should a mistrial have been granted because of improper remarks made by plaintiffs' counsel in his closing argument?

3. Did the trial court abuse its discretion in failing to order vacatur or remittitur of the $1 million dollars punitive damage award based on a $49,500.00 compensatory damage award?

4. Was the award of $1 million dollars in punitive damages unconstitutional?

## ISSUES RAISED ON CROSS–APPEAL

1. Did the trial court abuse its discretion when it struck the punitive damages award against the brokers because there

were no compensatory damages awarded by the jury?

2. Did the trial court err in excluding Jones' income tax returns?

## STANDARD OF REVIEW

 Admissibility of evidence is within the sound discretion of the trial court and its ruling will not be disturbed unless there has been an abuse of discretion. *Buckley v. Fredericks*, 291 N.W.2d 770 (S.D.1980). The trial court has broad discretion in balancing probative value of evidence against its prejudicial effect and this ruling will not be disturbed on appeal absent abuse of discretion. *Time Out, Inc. v. Karras*, 469 N.W.2d 380 (S.D.1991).

## ISSUE I

Was evidence of the plaintiffs' other profitable investments with the defendants improperly excluded?

 The case involves an issue on admissibility of mitigating evidence where a punitive damage claim has been submitted to the jury.[6] Jones has not contested the jury's award of compensatory damages on Plaintiffs' cause of action for fraud, deceit and misrepresentation. This court has not ruled on this specific issue and this is our maiden voyage into this area of the law.[7]

At trial, Jones attempted to introduce a summary of Plaintiffs' and Jones' numerous business transactions during the years their broker/client relationship existed. Jones contends this evidence would show the complete picture of how Plaintiffs were treated in their financial dealings. The trial court ruled this evidence was irrelevant and, if relevant, its prejudicial effect substantially outweighed any probative value. The trial court did

---

6. Plaintiffs claim Jones did not preserve this issue for appeal because Jones did not tell the trial court why the evidence was being offered. *Roach v. Snedigar*, 76 S.D. 63, 72 N.W.2d 427 (1955). We have considered these contentions in light of the settled record and trial transcripts, and conclude that Jones sufficiently preserved the issues for appellate review. *Rensch v. Rid-*

*dle's Diamonds of Rapid City*, 393 N.W.2d 269 (S.D.1986).

7. There is a relative paucity of decisions dealing with the admissibility of mitigating evidence in punitive damage cases.

allow the jury to consider a sanitized version of this investment relationship; namely, Plaintiffs' investments prior to the Baldwin and NRM sales, but not the amount invested or earned from them.

After this ruling, Plaintiffs characterized Jones as a "bank robber," a "master of deceit," "rotten to the core" and like a "wolf in sheep's clothing." There is no question the jury found Jones' business conduct less than exemplary in regards to the Baldwin and NRM transactions, based on the evidence submitted for proving Plaintiffs' entitlement to compensatory damages.

There is no dispute the issue of punitive damages was properly submitted to the jury. The jury was correctly instructed on punitive damages and obviously concluded from the evidence that Jones caused injury to Plaintiffs "through oppression, fraud, malice, willful and wanton misconduct or reckless disregard of Plaintiffs' rights."

The jury was instructed that, in determining the amount of punitive damages, it should consider the following factors: "(1) The amount allowed in actual damages; (2) *the nature and enormity of the wrongs;* (3) the intent of the defendant; (4) the defendant's financial condition; and (5) *all of the circumstances attendant to the defendant's actions, including any mitigating circumstances which may operate to reduce without wholly defeating punitive damages.*" (Emphasis added.) *See Hoff v. Bower,* 492 N.W.2d 912 (S.D.1992); *Flockhart v. Wyant,* 467 N.W.2d 473 (S.D.1991); *Groseth Int'l Inc. v. Tenneco Inc.,* 440 N.W.2d 276 (S.D.1989); *Wangen v. Knudson,* 428 N.W.2d 242 (S.D.1988).

Since exemplary damages are given in most jurisdictions by way of punishment to an evildoer, *all circumstances tending to*

prove that the defendant was without evil design, or though such design is admitted, to mitigate its existence, are admissible in evidence, either to show that punitive damages should not be allowed, *or if allowed, that they should be more restricted than if he had acted without provocation and in the absence of mitigating circumstances.*

22 Am.Jur.2d Damages § 925 (1988) (emphasis added).

The jury was instructed to consider "all of the circumstances attendant to the defendant's actions, including any mitigating circumstances." The manner in which Jones handled Plaintiffs' other investments could reasonably have a restricting effect on the jury when Jones is defending against inflammatory rhetoric comparing their business practices to that of a "bank robber," "wolf in sheep's clothing," and a "master of deceit." The jury should be allowed to consider a total picture of the parties' business relationship when asked to assess punitive damages.[8] Blinders should not be placed on a jury when it is called upon to assess punishment, *i.e.,* punitive damages.

The trial court also ruled if such evidence is relevant it should be excluded because the probative value is substantially outweighed by the danger of unfair prejudice. SDCL 19–12–3. We disagree.

"As used in SDCL 19–12–3, the term 'prejudice' does not mean damage to the opponent's case that results from the legitimate probative force of the evidence; rather it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *Kaarup v. Schmitz, Kalda and Associates,* 436 N.W.2d 845, 850 (S.D.1989) (citing *State v. Dokken,* 385 N.W.2d 493 (S.D.1986)). Admitting this evi-

---

**8.** The dissent of Justice Wuest cites to 22 Am. Jur.2d *Damages* § 807, which also includes the following: "... including any mitigating circumstances which *may* operate to reduce the award without wholly defeating it." (Emphasis added.) The allowance of the evidence pertaining to the ongoing business relationship between these parties will not wholly defeat the claim for punitive damages, since the jury award of compensatory

damages on the fraud, deceit and misrepresentation claims have not been appealed and stand in place. The effect of this mitigating evidence on a subsequent award of punitive damages is unknown, but on retrial of the punitive damage issue the punitive damage award by a jury could be the same, could be less, or could exceed the award in the prior trial.

dence would not give Jones an unfair advantage to persuade by illegitimate means. Rather, it would level the playing field and aid the jury in determining punitive damages. A jury trial is a search for the truth.[9] In order to determine the truth, the fact-finder should have an opportunity to consider all facts regarding the parties' relationship, and then the fact-finder can determine what is an appropriate punishment.

"In determining the amount of punitive damages, as well as in deciding whether they should be given at all, the trier of fact can properly consider *not merely the act itself but all the circumstances* including the motives of the wrongdoer, [and] *the relations of the parties.*" Restatement (Second) of Torts § 908 Comment e (1979) (emphasis added). Where punitive damages are sought, a defendant "is entitled to introduce facts tending to rebut such evidence [as to circumstances warranting imposition of exemplary damages] and in mitigation." *Herrmeyer v. Kleeman,* 76 Wis.2d 410, 251 N.W.2d 445, 447–48 (1977) (citing 25 C.J.S. Damages § 127, page 1171 (1966)). *See also Hannahs v. Noah,* 83 S.D. 296, 158 N.W.2d 678 (1968).

Jones cites *Davis v. Merrill Lynch, Pierce, Fenner & Smith,* 906 F.2d 1206 (8th Cir. 1990), to support its position that such mitigating evidence should be admissible. Although *Davis* is a churning case, some of its principles apply in this case. *Davis* demonstrates a defendant's right to present evidence in an effort to avoid or mitigate punitive damages. In *Davis,* the defendant, Merrill Lynch, was permitted to show the jury that, after learning of an employee's miscon-

duct, it promptly terminated the employee and notified the employee's clients that improper trading may have occurred and that they had credited the plaintiff's account for the unauthorized trades which were made by the employee. While declining to reverse or reduce the punitive damage award, the *Davis* court held: "Merrill Lynch undoubtedly argued to two juries that its remedial conduct should eliminate or reduce the amount of punitive damages. Both juries were unpersuaded by this argument, and we are unpersuaded that the juries' findings should be overturned." *Id.,* 906 F.2d at 1225.

The defendants in *Davis* were permitted to introduce evidence in an attempt to mitigate the amount of punitive damages. Whether the jury in this case would have been persuaded by the fact that Plaintiffs' other investments were profitable is not known. Nevertheless, Jones should have had an opportunity to present mitigating evidence just as the defendants in *Davis* were allowed.

Punitive damages are awarded to punish the wrongdoer and deter others from similar wrongdoing. *Hulstein v. Meilman Food Indus., Inc.,* 293 N.W.2d 889 (S.D.1980). "The allowance and amount of punitive damages turns on the particular facts of each case." *Id.* at 892 (citation omitted). The jury should be permitted to consider the entire relationship, not just an intensified examination of one or two transactions which resulted in a loss. In this case, the jury was only allowed to consider the negative aspects of the relationship but was denied the opportunity to consider any positive aspects when determining the degree of punishment.[10]

9. It is for the jury to search out the truth. *State v. Myers,* 88 S.D. 378, 383, 220 N.W.2d 535, 538 (1974). "The jury system is the foundation stone of our whole judicial concept. It is designed to provide all persons with a fair factual determination before judgment." *Florida Power Corp. v. Smith,* 202 So.2d 872, 882 (Fla.1967). "A jury is the tribunal provided by law to determine the facts and to fix the amount of damages." *Parker v. Winnipiseogee Lake Cotton & Woolen Co.,* 67 U.S. (2 Black) 545, 553, 17 L.Ed. 333, 338 (1863).

10. A recent U.S. Supreme Court decision emphasized the importance of judicial review in puni-

tive damage cases. "Punitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences. Judicial review of the amount awarded was one of the few procedural safeguards which the common law provided against that danger." *Honda Motor Co. v. Oberg,* —— U.S. ——, 114 S.Ct. 2331, 129 L.Ed.2d 336 (1994).

As Plaintiffs explored Jones' involvement and history in the Baldwin and NRM securities, they maligned Jones as a "bank robber", "master of deceit", and a "wolf in sheep's clothing." It is only fair and equitable that Jones be allowed to introduce evidence which could have a mitigating effect on the amount of punitive damages. This holding should not be interpreted as condoning the conduct of Jones in this matter. It is clear the jury concluded that Jones' practices were less than exemplary in these transactions and as previously stated, Jones has not contested that finding.

In fairness to the trial court, this is a case of first impression with respect to the admissibility of mitigating evidence in a punitive damage case in South Dakota and the trial court did not have the benefit of appellate guidance on this issue. *Associated Press v. Bradshaw*, 410 N.W.2d 577, 580 (S.D.1987).

We deem it unnecessary to address the remaining issues raised by appellant Jones based on our ruling of this issue.

## CROSS–APPEAL ISSUE I

Can punitive damages be awarded absent an award for compensatory damages?

■ The jury verdict awarded Plaintiffs $10,000.00 in punitive damages against Edwards and $8,500.00 of punitive damages against Tebben. The trial court struck these awards because the jury did not find Edwards or Tebben liable for any compensatory damages. Plaintiffs claim that punitive damages should be allowed because the compensatory damages award against Jones will vicariously sustain an award of punitive damages against the two individual defendants. This is not the law in South Dakota.

"Generally, an agent can be held liable to a third party only for his or her own separate tortious acts, and that obligation is founded on the common law principle that every per-

son must act in a manner so as not to injure another." *Husky Spray Service, Inc. v. Patzer*, 471 N.W.2d 146, 154 (S.D.1991) (citing 3 Am.Jur.2d Agency § 309 (1986)). The jury, after proper instruction, did not find Edwards or Tebben liable for compensatory damages. "If the jury does not award compensatory damages, the plaintiff has failed to prove the tort." Vol. 5, Minzer, *Damages in Tort Actions*, § 40.33 (1993). The jury determined that Jones, as a principal, caused the loss not Edwards or Tebben, as agents.

■ The jury found Edwards and Tebben liable for punitive damages only. This court has consistently held that punitive damages are not allowed absent an award for compensatory damages. *Time Out Inc.*, 469 N.W.2d at 386; *Speck v. Anderson*, 349 N.W.2d 49, 51 (S.D.1984); *Johnson v. Kirkwood, Inc.*, 306 N.W.2d 640, 643 (S.D.1981). "The rationale of the rule requiring actual damages before punitive damages may be awarded is that we do not punish conduct, no matter how malicious or reprehensible, which in fact causes no injury." *Dicker v. Smith*, 215 Kan. 212, 523 P.2d 371, 375 (1974). " 'Fraud, without damage, or damage, without fraud, gives no cause of action; but, where these two do occur, there an action lieth.' " Vol. 2, James D. Ghiardi & John J. Kircher, Punitive Damages Law & Practice, § 19.17 (1985) (quoting *Wall v. Graham*, 192 Ala. 396, 68 So. 298, 299 (1915)).

Consequently, the trial court's excise of the punitive damages was proper under South Dakota law and we find no abuse of discretion by the trial court in denying Plaintiffs a new trial.

## CROSS–APPEAL ISSUE II

Did the trial court err in excluding Jones' income tax returns?

■ Plaintiffs offered Jones' 1991 income tax return as evidence of Jones' ability to respond to punitive damages because it in-

cluded the income paid to the general and limited partners which comprise Jones. The trial court would not admit the tax return, finding the prejudicial effect of the tax return substantially outweighed its probative value.[11] We disagree.

■ As a general rule, where the plaintiff is entitled to exemplary damages, evidence of defendant's pecuniary circumstances is admissible. *Smith v. Weber,* 70 S.D. 232, 16 N.W.2d 537 (1944). "The wealth of the defendant is ... relevant, since the purposes of exemplary damages are to punish for a past event and to prevent future offenses, and the degree of punishment or deterrence resulting from a judgment is to some extent in proportion to the means of the guilty person." Restatement (Second) of Torts § 908 Comment e (1979).

The defendant's net worth (assets minus liabilities) is the traditional guideline for assessing the amount of punitive damages.

The defendant's balance sheet, its income tax return, or its annual report to stockholders provides sources of evidence of a defendant's net worth.

87 A.L.R.4th 141, 157–58 § 2b (1991).

"Net worth may not in all instances be the best measure of an individual's ability to respond in damages. We believe a more accurate gauge is his financial resources, which include his earnings as well as his net worth." *Jones v. Fisher,* 42 Wis.2d 209, 166 N.W.2d 175 (1969). Evidence such as federal income tax returns and other evidence of a defendant's income and earnings should be admitted when determining a defendant's ability to pay punitive damages. *Wortman v. Shipman,* 293 Ark. 253, 737 S.W.2d 438 (1987); *Hess v. Treece,* 286 Ark. 434, 693 S.W.2d 792 (1985), *cert. denied* 475 U.S. 1036, 106 S.Ct. 1245, 89 L.Ed.2d 354 (1986).

■ Net income is an appropriate yardstick for determining punitive damages.

Vol. 1, James D. Ghiardi & John J. Kircher, Punitive Damages Law & Practice § 5.36 (1992 cumulative supplement). For instance, Jones' consolidated financial statement shows that its net worth (assets minus liabilities) is approximately $100 million dollars. However, its 1991 federal income tax return shows its total income for the 1991 tax year to be more than $410 million dollars. A jury should become familiar with a defendant's financial circumstances before assessing punitive damages. In this case, a jury can accurately assess Jones' wealth only if it has access to Jones' complete financial makeup, including its income. Therefore, we find Jones' income should have been submitted for the jury's consideration.

This case is remanded for a new trial on punitive damages.

MILLER, C.J., concurs.

WUEST and SABERS, JJ., and HENDERSON, Retired Justice, concur in part and dissent in part.

KONENKAMP, J., not having been a member of the Court at the time this case was submitted to the Court, did not participate.

WUEST, Justice (concurring in part and dissenting in part).

I dissent on Issue I.

As noted in the conference opinion, evidentiary rulings of the trial court are to be reviewed under an abuse of discretion standard. *Zens v. Chicago, Milwaukee, St. Paul and Pac. R.R. Co.,* 479 N.W.2d 155, 159 (S.D.1991) (citations omitted). *See State v. Christopherson,* 482 N.W.2d 298, 300 (S.D. 1992). This court has long held that the test utilized in review of matters "involving judicial discretion is 'whether we believe a judicial mind, in view of the law and the circumstances, *could reasonably have reached that*

---

11. Plaintiffs also appealed the trial court's ruling on the tax returns and income summaries of Edwards and Tebben. Our holding on Cross-Appeal Issue I eliminates the need to address this issue.

conclusion.'" *Myron v. Coil,* 82 S.D. 180, 185, 143 N.W.2d 738, 740 (1966) (emphasis added) (quoting *F.M. Slagle & Co. v. Bushnell,* 70 S.D. 250, 254, 16 N.W.2d 914, 916 (1944)). *See In re Guardianship of Jacobsen,* 482 N.W.2d 634, 636 (S.D.1992); *Christopherson,* 482 N.W.2d at 300. It is my opinion that the trial judge in this case "could reasonably have reached [the] conclusion" that evidence of the Plaintiffs' other profitable investments with Jones could properly be excluded.

The Plaintiffs' action was brought as a result of the Baldwin and NRM investments with Jones. These were the transactions that were at issue in this case. Jones' proffered evidence purporting to show a "complete picture" of all the Plaintiffs' financial dealings with Jones was irrelevant as to the particular transactions at issue. The conduct of Jones at other times during the entire history of financial dealings with the Plaintiffs has no bearing on Jones' conduct as to the Baldwin and NRM transactions. Even if Jones dealt honestly and non-fraudulently in dozens of other transactions, this does not excuse or mitigate deceitful and fraudulent conduct as to other investment transactions with these Plaintiffs. It has been stated that, "In assessing exemplary damages, the trier of fact should consider ... all the circumstances attending *the particular occurrence* [.]" 22 Am.Jur.2d *Damages* § 807 (1988) (emphasis added). The "particular occurrences" in this case were the Baldwin and NRM transactions. The jury was aware that the Plaintiffs had a history of other transactions with Jones, and that the Plaintiffs were not complaining about those investments.

The jury had before it all the evidence needed to reach a proper verdict. I cannot find that the trial judge abused his discretion on this evidentiary ruling. Thus, I dissent on this issue.

As to the other issues, I concur in the writing.

HENDERSON, Retired Justice, joins my special writing.

SABERS, Justice (concurring in part, dissenting in part).

I dissent on Cross–Appeal Issue I on the basis that a compensatory damage award against a principal is sufficient to support a punitive damage award against the agent of that principal.

Both Schaffer and Ehrichs (Plaintiffs) were awarded compensatory and punitive damages against the principal, Edward D. Jones Co. They also were awarded punitive damages against the agents, Edwards and Tebben. The trial court struck these punitive damage awards, relying upon settled South Dakota law that punitive damages are not allowed absent an award of compensatory damages. *Case v. Murdock,* 488 N.W.2d 885, 889 (S.D.1992). Plaintiffs argue on cross-appeal that we should reinstate the punitive damage awards against Edwards and Tebben because they are supported by the award of compensatory damages against Jones. I agree.

The jury submitted three written questions. The first asked whether compensatory damages must be the same for all defendants. The second asked: "Can only one Defendant be listed for compensatory damages?" The third question asked "If punitive damages were to be awarded, can there be different dollar amounts for each Defendant?" In response, the jury was informed that it could assess punitive damages in differing amounts against each of the Defendants and referred to Instruction No. 41, which told the jury that it could assess damages "against either the individual broker or Edward D. Jones or both if the evidence so shows." Plaintiffs argue that "[g]iven the verdict, the language of Instruction 41 and the jury's questions, it is obvious the jury believed it could assess the compensatory damages solely against Jones and have that award serve as the basis for punitive damages against all the Defendants." I agree again.

Plaintiffs note that the jury was never told that an award of punitive damages must be supported by a *specific* award for compensatory damages. If such an instruction had been given, the jury may have awarded Plaintiffs at least nominal damages against

Tebben and Edwards sufficient to support an award of punitive damages. Plaintiffs failed to submit such an instruction, however, "and cannot now predicate error on the court's failure to so instruct." *Eldridge v. Northwest G.F. Mutual Ins. Co.*, 88 S.D. 426, 221 N.W.2d 16, 20 (1974) (citing SDCL 15–6–51(a); *Ross v. Foss*, 77 S.D. 358, 92 N.W.2d 147 (1958)).

Unlike the conference opinion however, I decline to view the failure to return compensatory damages against Edwards and Tebben as an exoneration by the jury. Rather, under the totality of the circumstances, the award of punitive damages is an indication by the jury that they believed Edwards and Tebben to be culpable parties whose willful disregard of Plaintiffs' rights warranted punishment. *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872, 881 (1982), *overruled in part by Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897, 908 (1991) (overruling *Wells* only "to the extent that it stands for the proposition that a jury may return an award for punitive damages without finding *any* compensatory damages.").

> Where there is evidence implicating the defendant[s] as [ ] active participant[s] in a tortious plan or scheme which deliberately disregards the rights of others, *and the jury returns compensatory damages against some of those involved in the scheme*, the failure of the jury to return an award of compensatory damages against a particular defendant will not of itself allow that defendant to escape liability for punitive damages assessed against him.

*Wells*, 297 S.E.2d at 881 (emphasis added).

There is even more reason against a broad application of the rule that prohibits punitive damages absent an award of compensatory damages here because compensatory damages against Jones clearly resulted, at least in part, from the conduct of the agents, Ed-

wards and Tebben. As noted by the conference opinion, "[t]he rationale of the rule requiring actual damages before punitive damages may be awarded is that we do not punish conduct, no matter how malicious or reprehensible, which in fact causes no injury." *Dicker*, 523 P.2d at 375. Therefore, the reasons for the rule are also satisfied because we are only punishing conduct which in fact caused injury. In fact, it would be improper for the jury to return compensatory damage verdicts against Edwards and Tebben if such damages were already included in the compensatory damages against Jones. Such would be prohibited as double recovery. *See Nelson v. Web Water Development Ass'n, Inc.*, 507 N.W.2d 691, 701 (S.D.1993) (Sabers, J., concurring specially).

In my opinion, the jury's failure to return an award of compensatory damages against Tebben and Edwards does not relieve them from liability for the award of punitive damages because the punitive damage awards are supported by the award of compensatory damages against Jones. The rule should be that an award of compensatory damages against the principal is sufficient to support an award of punitive damages against the agent of the principal. Therefore, I would reverse the trial court's granting of the motion to strike the punitive damage awards against Edwards and Tebben and remand with instructions to reinstate them.*

---

* I acknowledge an argument can be made that Plaintiffs failed to impress upon the jury the need to award compensatory damages sufficient to support an award for punitive damages and request the necessary jury instruction.